AMERICAN OFFSHORE, INC., AMERICAN VESSELS, INC., AND SUBSIDIARIES, AND ZODIAC OFFSHORE, INC., AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15225-86.          Filed November 25, 1991.

*Lawrence Kalinec, Jasper G. Taylor III, Ronald W. Adzgery,* and *Hugh E. Tanner,* for the petitioners.

*Melanie R. Urban* and *John F. Eiman,* for the respondent.

COLVIN, *Judge:* In this case we decide whether petitioners are entitled to bad debt deductions under section 166[1] in 1983 for an $11 million subordinated promissory note, and for transfers of funds to Offshore Machinery, Inc.

Respondent determined deficiencies in petitioners' income taxes as follows:

| Petitioner | Taxable period ending | Deficiency |
|---|---|---|
| American Offshore, Inc. | Sept. 30, 1982 | $513,667 |
| American Vessels, Inc., | Sept. 30, 1980 | 50,558 |
| & Subsidiaries | Sept. 30, 1982 | 281,821 |
|  | Feb. 28, 1983 | 146,434 |
| Zodiac Offshore, Inc., | Sept. 30, 1982 | 1,299,702 |
| & Subsidiaries | Feb. 28, 1983 | 162,372 |

After concessions, there are three issues for decision. The first two relate to petitioners' claim for bad debt deductions based on the $11 million subordinated promissory note. Those issues are:

(1) Whether the subordinated note became totally worthless in 1983. We hold that it did.

---

[1]Unless otherwise indicated, all statutory section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(2) Whether petitioners are barred from claiming a bad debt deduction under section 166 by the rules which limit the deferral available under section 453 if an installment obligation is disposed of or canceled. We hold they are not.

The third issue relates to transfers of funds to Offshore Machinery. That issue is:

(3) Whether transfers between related entities to repay debt owed to unrelated parties may be deducted as bad debts under section 166. We hold that the transfers were equity and not debt.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

1. *The Entities: AOI, AVI, Zodiac, and Offshore Machinery*

Petitioners American Offshore, Inc. (AOI), American Vessels, Inc. (AVI), and its subsidiaries, and Zodiac Offshore, Inc. (ZOI), owned and operated supply vessels and tugs, servicing offshore rigs involved in crude oil exploration, drilling, or production. AOI, AVI and its subsidiaries, and ZOI and its American subsidiaries were Delaware corporations with their principal place of business in Houston, Texas. Zodiac International and Zodiac Work Boats, S.A., both owned by AOI and ZOI, were Panamanian corporations. When the petitions were filed in this case, all petitioners and subsidiaries had been dissolved except for American Operators, Inc., and Zodiac International. Petitioners' vessels worked in the Gulf of Mexico and worldwide. Sam Albaral (Albaral) was financial officer for these companies.

AOI was formed in 1968 by Albaral and Daniel Hennessy (Hennessy). Albaral and Hennessy each owned 50 percent of the stock of AOI from 1968 to February 28, 1983.

AVI was incorporated in 1969 by Albaral and Hennessy. Albaral and Hennessy each owned 50 percent of the AVI stock from 1969 until February 28, 1983. AVI owned all of the stock of the following (the AVI subsidiaries): American Century Vessels, Inc., American Constellation Corp., American Delta Corp., American Galaxy, Inc., American Olympic Corp., and American Operators, Inc. (Operators).

ZOI was incorporated in 1969 by Albaral, Hennessy, Delo Caspary (Caspary), and Jerry Wendell (Wendell). Albaral

and Hennessy each owned 12.5 percent and Caspary and Wendell each owned 37.5 percent of the stock of ZOI from 1969 to February 28, 1983. ZOI owned all of the stock of Scorpio Offshore, Inc. (SOI).

On February 28, 1983, AOI, AVI and the AVI subsidiaries other than Operators, ZOI, and SOI were liquidated in transactions qualifying for nonrecognition of gain under section 337 and were dissolved.

Zodiac International is a Panamanian corporation. Before their liquidations, AOI owned 33 percent and ZOI owned 67 percent of the stock of Zodiac International. The stock of Zodiac International was distributed by AOI and ZOI to their respective shareholders.

Zodiac Work Boats, S.A. (ZWB), was a Panamanian corporation. AOI owned 33⅓ percent and ZOI owned 66⅔ percent of the stock of ZWB. On February 28, 1983, ZWB was liquidated in a transaction that would have qualified for nonrecognition of gain under section 337 had ZWB been a domestic corporation, and was dissolved.

Offshore Machinery & Supply, Inc. (Offshore Machinery), was incorporated in 1970. It purchased equipment for resale to petitioners for use on vessels they owned. Since 1970 Offshore Machinery purchased substantial amounts of equipment for resale. However, by 1979 to 1983 its inventory purchases had declined substantially. The same group managed petitioners and Offshore Machinery.

2. *Sale of Workboats and Receipt of the Subordinated Note*

The next findings of fact relate to petitioners' sale of the vessels to InterMarine, identified below.

a. *The Sellers—Omni and Petitioners*

In late 1980 or 1981, Albaral, Hennessy, Caspary, and Wendell incorporated Omni Offshore International, Inc. (Omni). It was formed to serve as a management and operating company and to help sell 12 workboats and the stock or assets of the entities named above. Albaral, Hennessy, Caspary, and Wendell each owned 25 percent of the Omni stock at all relevant times.

In May 1981, Omni and the entities listed below (vessel sellers) hired Simmons & Co. International (Simmons) as a

financial adviser to market and to structure the sale of the 12 ocean-going workboats listed below (the vessels) and certain assets of Omni (the Omni assets):

| Vessel seller | Vessel |
|---|---|
| American Galaxy, Inc. | M/V Galaxy |
| American Constellation Corp. | M/V Constellation |
| AVI | M/V American (formerly Big Orange XIV) |
| American Olympic Corp.. | M/V Big Orange IV |
| ZOI | M/V Capricorn |
| | M/V Big Orange V |
| | M/V Scorpio Del Golfo (formerly Big Orange VI) |
| SOI | M/V Big Orange IX |
| ZWB | M/V Grant Mariner (formerly Polar 901) |
| | M/V Grant Neptune (formerly Polar 902) |
| | M/V Big Orange I |
| Scorpio Offshore Partnership | M/V Big Orange VII |

Scorpio Offshore Partnership is not a petitioner in this case. However, it was a party to the sale and was allocated a portion of the consideration.

J.K. Tynan International, Inc. (Tynan), prepared two valuations for Omni and the sellers. The first was a market valuation survey which estimated that the market value of the 12 vessels was $27.3 million. The second was a replacement valuation survey in which Tynan estimated that the cost of replacing the 12 vessels was over $40 million.

b. *The Buyers—InterMarine*

InterMarine, Inc., Intermarine de Panama, S.A., and InterMarine Operations, Inc. (vessel buyers or InterMarine), were incorporated in January 1982 to purchase and operate 12 workboats.

InterMarine was owned by Marshall P. Cloyd (Cloyd) (80 percent), and Alfred E. Domaschk (Domaschk) (20 percent).

c. *The Agreement and the Sale*

On March 10, 1982, InterMarine agreed to purchase the 12 workboats and related personal property and contract

rights from the sellers (the agreement) for $26 million. InterMarine agreed to pay $15 million in cash and an $11 million subordinated promissory note (the subordinated note).

InterMarine also agreed to maintain net worth of at least $10 million and to increase net worth by $1 million for each of the next 3 years, to maintain a ratio of liabilities to net worth of not greater than 1.2 to 1.0, to maintain assets sufficient to equal liabilities, and to maintain a ratio of cash flow to debt of at least 1.5 to 1.0 throughout the term of the loan.

The vessel sellers allocated shares of the cash and the subordinated note pro rata among themselves. The vessel sellers and InterMarine allocated $100,000 to personal property and the Omni assets, and $25.9 million to the vessels (the vessels' purchase price). Seven of the 12 vessels were under charter to Dowell-Schlumberger or Grant Geophysical Corp. when the sale closed on March 23, 1982. The vessels' purchase price was allocated between the charters ($3.4 million) and the vessels ($22.5 million):

| | Allocated charter value | Allocated vessel value | Total value |
|---|---|---|---|
| M/V Grant Mariner (formerly Polar 901) | $796,280 | $3,036,375 | $3,832,655 |
| M/V Grant Neptune (formerly Polar 902) | 884,340 | 3,036,375 | 3,920,715 |
| M/V Big Orange I | 693,940 | 1,419,750 | 2,113,690 |
| M/V Big Orange IV | 454,920 | 2,160,000 | 2,614,920 |
| M/V Big Orange V | 71,060 | 2,045,250 | 2,116,310 |
| M/V Big Orange IX | 366,520 | 1,370,250 | 1,736,770 |
| M/V American (formerly Big Orange XIV) | 132,940 | 639,000 | 771,940 |
| M/V Galaxy | - - - | 1,811,250 | 1,811,250 |
| M/V Constellation | - - - | 1,849,500 | 1,849,500 |
| M/V Capricorn | - - - | 1,689,750 | 1,689,750 |
| M/V Scorpio Del Golfo | - - - | 1,278,000 | 1,278,000 |
| M/V Big Orange VII | - - - | 2,164,500 | 2,164,500 |
| TOTAL | 3,400,000 | 22,500,000 | 25,900,000 |

The vessel sellers' adjusted tax basis in the vessels was as follows:

| Vessel seller | Vessel | Adjusted tax basis |
|---|---|---|
| American Galaxy, Inc. | M/V Galaxy | $331,162 |
| American Constellation Corp. | M/V Constellation | 392,196 |
| AVI | M/V American (formerly Big Orange XIV) | 34,959 |
| American Olympic Corp. | M/V Big Orange IV | 1,008,385 |
| ZOI | M/V Capricorn | 348,061 |
| ZOI | M/V Big Orange V | 483,666 |
| ZOI | M/V Scorpio Del Golfo (formerly Big Orange VI) | 169,189 |
| SOI | M/V Big Orange IX | 265,545 |
| ZWB | M/V Grant Mariner (formerly Polar 901) | 1,353,515 |
| ZWB | M/V Grant Neptune (formerly Polar 902) | 1,381,423 |
| ZWB | M/V Big Orange I | 690,829 |
| Scorpio Offshore Partnership | M/V Big Orange VII | 1,047,007 |

The closing on the vessels was held on March 23, 1982. The vessel sellers reported the proceeds from the sale under the installment sale method. Sec. 453.

All of Cloyd's vessels were working until 98 days after the closing. A portion of the purchase price was allocated to the seven charters, but no allocation was made to any charter for the remaining five vessels.

d. *Financing the Agreement*

InterMarine borrowed $16 million from Allied Bank of Texas (Allied Bank) on March 23, 1982, to fund the $15 million cash downpayment, with the remaining outstanding principal due on May 31, 1987. The $16 million note due to Allied Bank was payable in 19 consecutive quarterly installments of $500,000 in principal, plus interest. The first installment was payable on August 31, 1982. Interest was first payable on May 31, 1982.

The starting point for financing the Intermarine transaction was an optimistic set of projections for the energy services industry. The projections were based on assumptions that rates at which the vessels would work, day rates, would continue to escalate well above the 1981 rates.

InterMarine provided a variety of security and collateral to Allied Bank. These included first preferred fleet mortgages on the 12 vessels, charter assignments, a revolving

note, and a term note. Allied Bank was secured by a first position in all of the assets of InterMarine. Cloyd and Domaschk also personally guaranteed the InterMarine debts owed to Allied Bank.

### e. *Subordination Agreement in Favor of Allied Bank*

Allied Bank, the vessel sellers, and the buyers entered into a subordination agreement in favor of Allied Bank (Allied subordination agreement). Under the Allied subordination agreement, InterMarine agreed to maintain at least $1.1 million in cash on hand and to furnish annual audited statements and monthly unaudited statements and budget projections for the future year.

The Allied subordination agreement recognized the bank's right to be paid before any payment was made to the sellers. It required the debt to Allied Bank to be paid in full before payments could be made on the $11 million subordinated note given to the vessel sellers.

The Allied subordination agreement also provided that upon sale or loss of a vessel, the proceeds of sale or insurance would be used either to pay the principal amount of the loans or to buy a replacement vessel which would become collateral for the mortgages of the bank and the sellers.

### f. *Payments to Allied Bank*

Before March 1983, InterMarine made scheduled debt service payments to Allied Bank by conserving cash through not paying trade creditors and borrowing additional funds. By May 31, 1982, InterMarine paid Allied Bank a $559,561.64 interest payment. By August 31, 1982, InterMarine paid $500,000 in principal and $719,780.81 in interest. By November 30, 1982, InterMarine paid $500,000 in principal and $594,376.70 in interest. By March 4, 1983, InterMarine had paid an additional $500,000 in principal and $499,315.06 in interest.

As of September 1989, InterMarine owed Allied Bank more than $9 million as unpaid principal on this debt.

g. *Sale of the Polar Vessels*

On January 14, 1983, InterMarine de Panama, S.A., sold the M/V Grant Mariner (formerly Polar 901) and the M/V Grant Neptune (formerly Polar 902) (collectively, the Polar vessels) to Grant Geophysical Corp. (Grant).

At the time of the sale of the Polar vessels to Grant, InterMarine intended to enter into binding commitments to replace the Polar vessels within 180 days after the date of sale. InterMarine's only hope of covering its obligations to Allied Bank was to manage as many vessels as it possibly could, hoping to generate some cash flow to pay the bank.

InterMarine received $8 million from the sale of the Grant Mariner and the Grant Neptune. InterMarine took delivery of one vessel pursuant to the replacement clause in the agreement. The vessel cost $4,325,529, leaving less than $3.7 million to be used in the operations of InterMarine or paid to the bank.

InterMarine agreed to pay $125,000 to the vessel sellers as a settlement of a dispute involving the use of the Polar vessels' sales proceeds. In November 1984, approximately 21 months after the sale of the Polar vessels for $8 million, the vessel sellers received payment of $125,000. This was a payment for the release of all claims against Allied Bank and InterMarine relating to the disposition of the funds from the sale of the Polar vessels.

No note payments had been received by the vessel sellers on the subordinated note as of 1989.

3. *The Subordinated Note*

The $11 million note payable to the sellers was subordinated to any debt owed to Allied Bank. It did not require InterMarine to make payments on fixed dates before maturity. For the first year, no payment would be made unless revenues exceeded expenses by more than $1.5 million. Thereafter, one-half of any net cash-flow would be paid to the sellers. Any unpaid principal plus all accrued interest was due on March 31, 1987. The shareholders of InterMarine, Cloyd and Domaschk, were also required to make personal guarantees for payment of the subordinated note.

The subordinated note was secured by a subordinated security agreement from InterMarine in favor of Albaral and Caspary, cotrustees (the Albaral/Caspary subordination agreement). Second preferred fleet mortgages were issued on the 12 vessels by InterMarine to Albaral and Caspary.

Neither Simmons nor the sellers expected any payments to be made on the subordinated note until at least 1985, even if InterMarine realized the large projected increases in day rates and maintained above—average workboat utilization rates. In addition to guaranteeing Allied Bank debts, Cloyd and Domaschk also personally guaranteed the InterMarine debts owed to the vessel sellers. Cloyd's net worth was approximately $1 million as of December 31, 1981, and $825,950 on December 31, 1982. Domaschk's net worth was $756,000 from October 1, 1981, through July 1, 1982.

Between March 1982 and February 1983 the subordinated note was transferred to the sellers' agents, Caspary and Albaral, for collection. The sellers never notified InterMarine that the indebtedness was transferred.

### 4. *The Industry Downturn*

Demand was strong in the offshore service and supply industry in 1981 and early 1982 and charter rates were high. However, during late 1982 and early 1983, there was a slump.

As of February 28, 1983, many factors, including a decrease in day rates, a decrease in utilization, and an increase in the number of vessels put up for sale indicated a severe downswing.

During 1982 and 1983 day rates decreased sharply. North Sea and Gulf of Mexico day rates declined steadily during the 1982 to 1983 period. From mid-1982 to mid-1983, the day rates for North Sea tug/supply vessels fell to about a third of what they had been, small North Sea supply vessels fell to 15 to 30 percent of what they had been, and Gulf of Mexico supply vessels fell to approximately 45 percent of what they had been.

The utilization rate for the InterMarine vessels was dropping on February 28, 1983. The workboats that had long-term charters when owned by the sellers continued to work under those charters for the buyers. However, several

workboats ceased work under the charters. Other InterMarine vessels had no work.

Eight days after InterMarine purchased the vessels, Dowell Schlumberger canceled a contract on one of the vessels. It soon became impossible to get any work in South America or in West Africa, forcing InterMarine to turn to Iran. After over 4 months, other vessels, such as the Grant Mariner and the Grant Neptune, were similarly idle.

The market in early 1983 for the type of vessels involved here was depressed. By February 28, 1983, there was virtually no market for used workboats. Financing to purchase a vessel was difficult to obtain in late 1982 and early 1983 due to a decline in value of collateral and cash-flow.

Within 9 days after the loan agreement was signed, InterMarine was in technical default for violating covenants concerning cash on hand. They were later in default for violating covenants concerning increase in net worth over succeeding years and ratios of liabilities to net worth. InterMarine remained in default of the loan agreement continuously thereafter. However, Allied Bank waived its rights in connection with this noncompliance.

InterMarine was unable to maintain the vessels at the same level in late 1982 and early 1983 as at the time of purchase because of reduced cash-flow. InterMarine's yearly losses starting with February 28, 1983, are summarized as follows:

| Year | Retained earnings deficit (ending balance) | Retained earnings deficit (beginning balance) | Yearly loss |
|------|------|------|------|
| 1983 | $2,755,160 | $844,217 | $1,910,943 |
| 1984 | 5,064,749 | 2,755,160 | 2,309,589 |
| 1985 | 9,022,652 | 5,064,749 | 3,957,903 |
| 1986 | 11,987,921 | 9,022,652 | 2,965,269 |
| 1987 | 15,230,823 | 11,987,921 | 3,242,902 |
| Total losses from Feb. 28, 1983, to Dec. 31, 1987 | | | 14,386,606 |

As of 1989, InterMarine had not made any payments on the subordinated note which became due on March 31, 1987.

5. *Amount Obtainable by Liquidating Collateral*

On February 28, 1983, the value of the subordinated note depended on several factors, including the value of the

collateral. The vessels lost value because of the unexpected and rapid deterioration of the offshore supply vessel market, which began shortly after the sale. We find that the fair market value of the vessels on February 28, 1983, was $9 million.

InterMarine's assets also included the seven long-term contracts InterMarine bought in March 1982 when it purchased the 12 workboats. However, the contracts did not result in much work for the vessels and were not of much value. Charterer and owner relationships were largely personal and could not be sold.

InterMarine purchased $100,000 of tangible assets and also received at least $150,000 worth of engines as a part of a settlement with the vessel sellers.

InterMarine purchased a going concern as well as tangible assets and contract rights. The going-concern value included goodwill, future earnings potential, and long-term charter rights. These customer relationships had some value under the circumstances, but not much.

As of February 28, 1983, after the sale of the Grant Mariner and the Grant Neptune, the consolidated balance sheets of InterMarine showed total assets of $28,898,677. This included workboats and equipment costing $17,684,317, less depreciation.

The personal guarantees gave no value to the subordinated note because the guarantees were subordinate to those given to Allied Bank, the net worth of the shareholders was small in relation to the likely collateral shortfall on the senior debt, and most of the assets comprising the shareholders' net worth would be inaccessible to creditors in bankruptcy proceedings.

6. *Transfers of Funds to Offshore Machinery*

The following findings of fact relate primarily to the third issue for decision regarding transfer of funds to Offshore Machinery.

On and before February 28, 1983, Offshore Machinery stock was owned equally (25 percent each) by Albaral, Hennessy, Caspary, and Wendell. Neither ZOI nor Operators owned any of the stock of Offshore Machinery.

The following chart is a summary of the relevant funds transferred between Offshore Machinery and ZOI:

| Fiscal year | Payments to Offshore Machinery | Payments by Offshore Machinery | Cumulative balance owed to/by ZOI |
|---|---|---|---|
| 1976 | - - - | - - - | - - - |
| 1977 | - - - | $3,236 | $(3,236) |
| 1978 | - - - | 72 | (3,308) |
| 1979 | - - - | - - - | (3,308) |
| 1980 | $78,308 | - - - | 75,000 |
| 1981 | - - - | - - - | 75,000 |
| 1982 | 370,000 | - - - | 445,000 |
| 1983 | 45,000 | - - - | 490,000 |

The following chart is a summary of the relevant transferred funds between Offshore Machinery and Operators:

| Fiscal year | Payments to Offshore Machinery | Payments by Offshore Machinery | Cumulative balance owed to/by Operators |
|---|---|---|---|
| 1976 | $47,799.67 | $9,834.84 | $188,935.00 |
| 1977 | 118,307.21 | 20,615.05 | 284,971.93 |
| 1978 | 139,513.33 | 120,891.42 | 303,715.35 |
| 1979 | 63,431.94 | 725,891.42 | (356,638.13) |
| 1980 | 193,000.00 | 7,000.00 | (170,638.13) |
| 1981 | 272,000.00 | 183,137.38 | (81,775.51) |
| 1982 | 561,775.51 | 40,000.00 | 440,000.00 |

Offshore Machinery received from and returned to ZOI and Operators substantial amounts of money on open account. Offshore Machinery owed ZOI $75,000 at the end of 1979, increasing to $445,000 on December 31, 1982, and $490,000 on February 2, 1983. Offshore Machinery charged off $440,000 in February 1983, leaving a balance of $50,000. Offshore Machinery owed Operators $440,000 by December 31, 1982, of which $220,000 was charged off on February 4, 1983. A balance remained to be paid as of September 1983.

No interest was accrued or paid on the transfers from Operators and ZOI to Offshore Machinery. There was no written agreement relating to the transfers. Offshore Machinery did not sign a note payable to Operators for any loans made since 1973, or to ZOI for any loans made since 1970. For accounting and tax purposes Offshore Machinery, ZOI, and Operators treated the funds transferred as loans.

. The transfers to Offshore Machinery were used to repay its loans from Capital National Bank and Victoria Bank & Trust.

Offshore Machinery had no claim to the moneys received from the sale of the 12 vessels to InterMarine. It had no means remaining to generate funds to repay the advances. In the meantime, Offshore Machinery owed substantial amounts of money to Capital National Bank and Victoria Bank & Trust, but had no means to repay other than the shareholders' personal guarantees. By advancing sums to Offshore Machinery at the direction of Offshore Machinery shareholders, ZOI and Operators provided funds to repay outside creditors.

## OPINION

Petitioners contend that they are entitled to bad debt deductions for the $11 million subordinated note and certain transfers of funds to Offshore Machinery. There are three issues for decision. The first two issues arise from petitioners' claim for a bad debt deduction for the $11 million subordinated note. First, respondent argues that a bad debt deduction is not available to petitioners because petitioners reported the sale as an installment sale and there has not been a disposition of the installment obligation under section 453B(a). Second, respondent argues that petitioners failed to prove that the $11 million subordinated note was worthless on February 28, 1983.

The third issue is whether certain transfers of funds to Offshore Machinery were equity rather than debt. We will address the worthlessness issue first.

## 1. *Worthlessness of the $11 Million Subordinated Note*

By amended petition, petitioners contend that the $11 million subordinated note was totally worthless as of February 28, 1983. Respondent argues that petitioners have failed to carry their burden of proving worthlessness. Section 166(a)(1) allows a deduction for any debt that becomes wholly worthless within the taxable year. Section 166(a)(1) provides:

SEC. 166. BAD DEBTS.

    (a) GENERAL RULE.—

        (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

        (2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

    (b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

### a. *Background*

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deductions. Rule 142(a); *Deputy v. DuPont,* 308 U.S. 488, 493 (1940); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440 (1934); *Welch v. Helvering,* 290 U.S. 111, 115 (1933).

The taxpayer must prove that the debt had value at the beginning of the year in which it allegedly became worthless and that it became worthless during that year. *Estate of Mann v. United States,* 731 F.2d 267, 275 (5th Cir. 1984); *James A. Messer Co. v. Commissioner,* 57 T.C. 848, 861 (1972). Petitioners' bad debt deduction is limited to their adjusted basis in the obligation. Sec. 166(b).

The taxpayer must usually show identifiable events to prove worthlessness in the year claimed. *United States v. S.S. White Dental Manufacturing Co.,* 274 U.S. 398 (1927); *Dallmeyer v. Commissioner,* 14 T.C. 1282, 1291-1292 (1950). Both parties cite *Estate of Mann v. United States, supra.* In that case, the court said:

Debts are wholly worthless when there are reasonable grounds for abandoning any hope of repayment in the future, *Dallmeyer v. Commissioner,* 14 T.C. 1282, 1292 (1950), and it could thus be concluded that they have lost their "last vestige of value." *Bodzy v. Commissioner,* 321 F.2d 331, 335 (5th Cir. 1963). This will usually entail proof of the existence of identifiable events which demonstrate the valuelessness of the debts. *Riss v. Commissioner,* 478 F.2d 1160 (8th Cir. 1973); *Crown v. Commissioner,* 77 T.C. 582, 598 (1981); *Hubble v. Commissioner,* 42 T.C.M. 1537, 1544 (1981). [*Estate of Mann v. United States, supra* at 276.]

When or whether a debt becomes worthless is a question of fact, the answer to which lies in an examination of all the circumstances. *Boehm v. Commissioner,* 326 U.S. 287, 293 (1945); *Estate of Mann v. United States, supra* at 275; *Dallmeyer v. Commissioner, supra* at 1291. When a debt becomes worthless is to be decided by the trier of fact. *Cole v. Commissioner,* 871 F.2d 64, 66 (7th Cir. 1989), affg. T.C. Memo. 1987-228. A bad debt is deductible only in the year it becomes worthless. *Denver & Rio Grande Western Railroad Co. v. Commissioner,* 32 T.C. 43, 56 (1959), affd. 279 F.2d 368 (10th Cir. 1960); *Feinstein v. Commissioner,* 24 T.C. 656, 658 (1955).

Worthlessness is determined by objective standards. *Perry v. Commissioner,* 22 T.C. 968, 973 (1954). Some factors that have been considered by courts in determining worthlessness include the subordinated status of the debt (*Cole v. Commissioner, supra* at 67); a decline in the debtor's business (*Continental Illinois National Bank & Trust Co. of Chicago v. United States,* 81-1 USTC par. 9185 (N.D. Ill. 1981)); the decline in value of the property secured by the debt (*Meurer Steel Barrel Co. v. Commissioner,* 7 B.T.A. 64, 66 (1927)); claims of prior creditors far in excess of the fair market value of all assets available for payment (*Hadley Falls Trust Co. v. United States,* 110 F.2d 887, 890-891 (1st Cir. 1940)); the overall business climate (*Cole v. Commissioner, supra*); the debtor's earning capacity (*Cole v. Commissioner, supra*); the debtor's serious financial reverses (*Cole v. Commissioner, supra*); guarantees on the debt (*Cole v. Commissioner, supra*); events of default, whether major or minor (*Cole v. Commissioner, supra*); insolvency of the debtor (*Cole v. Commissioner, supra*); the obligor's refusal to pay (*Cole v. Commissioner, supra*); abandonment of assets or business (*Cole v. Commissioner, supra*); ill health, death, or disappearance of the principals (*Cole v. Commissioner, supra*); bankruptcy or receivership (*Cole v. Commissioner, supra*); actions of the obligee in pursuing collection, i.e., whether the obligee unreasonably failed to take collection action and then claimed the deduction (*Cole v. Commissioner, supra; Davies v. Commissioner,* 54 T.C. 170, 176 (1970)); subsequent dealings between the obligee and obligor

(*Cole v. Commissioner, supra*); and lack of assets (*Cole v. Commissioner, supra*).

No single factor is conclusive as there are no absolutes in this area. See 2 B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts, sec. 33.3.1, pp. 33-10 to 33-11 (2d ed. 1990). Default is a factor considered in deciding whether an obligation is worthless. *Cole v. Commissioner, supra.* The first payment under the note was not expected until 1985 under optimum conditions. No payments were due as of February 28, 1983. However, the fact that a debt had not matured does not prevent a finding of worthlessness. *Bonynge v. Helvering,* 117 F.2d 157, 158 (2d Cir. 1941), affg. 41 B.T.A. 84 (1940); *Robert Smith Corp. v. Commissioner,* 21 B.T.A. 1400, 1405 (1931). Similarly, the fact that a bad debt is not due at the time of deduction does not of itself prevent its allowance under section 166. Sec. 1.166-1(c), Income Tax Regs. A taxpayer need not wait for a default before taking a bad debt deduction if the debt is clearly worthless before any payments are due. *Bonynge v. Helvering, supra* at 158.

Legal action is not required before a bad debt deduction is allowable where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment. However, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166. Sec. 1.166-2(a) and (b), Income Tax Regs.; *Exxon Corp. v. United States,* 785 F.2d 277, 279 (Fed. Cir. 1986). In determining worthlessness, no one factor is controlling.

It is obvious that there is no precise test for determining worthlessness within the taxable year and neither the statutory enactment, its regulations, nor the decisions attempt such an all-inclusive definition. * * * Furthermore, it is often impossible to select a single factor or "identifiable event" which clearly establishes the time at which a debt becomes worthless and thus deductible. * * *

*Minneapolis, St. Paul Railroad v. United States,* 164 Ct. Cl. 226, 240 (1964). All pertinent evidence should be considered. Sec. 1.166-2(a), Income Tax Regs.

Applying these factors to this case we conclude that as of February 28, 1983, there were reasonable grounds for abandoning any hope of repayment of the $11 million subordinated note. We also conclude that the collapse of the offshore oil rig supply industry leading to the loss in value of the vessels is a sufficiently identifiable set of circumstances to explain the worthlessness of the subordinated note.

There are two means of pursuing repayment here. One is through foreclosure. The other is through the default provisions contained in the subordinated note.

### b. *Foreclosure*

The key to obtaining repayment through foreclosure is the value of the security. The major assets securing the note were the vessels. Respondent argues that the value of the vessels was $11 million. However, respondent's expert, Lasky, testified that the fair market value of the vessels could have been much less than $11.3 million. The market for vessels like those that petitioners sold to InterMarine experienced a steep decline. We have found that the value of the vessels was $9 million. This amount would be inadequate to pay the more than $15 million owed by Intermarine on the first mortgage with Allied Bank.

Respondent argues that we must consider the value of the other assets, including such intangible property as long-term charters or goodwill; other tangible property; and the personal guarantees. We have found such value to be minimal. Respondent's expert testified that the charters were based on personal relationships that could not be sold. The nine diesel engines had some value, but not much. We have also found the personal guarantees to have no value to the vessel sellers on February 28, 1983.

### c. *Default Provisions*

Repayment through the formulas in the note was unlikely. All of the witnesses agreed that 1981 was the best year ever in the industry and that early 1982 was a time of high expectations. The vessel financing formulas upon which the subordinated note was based used an optimistic set of projections for the energy service industry. These

projections were based on assumptions that the day rates for charter of the vessels would increase above the 1981 rates. Thus, payments to the sellers on the subordinated note would only be made if the day rates obtained for the vessel were well above those in effect in 1981.

By early 1983 the industry was in a steep decline. Even respondent's expert witness believed that the industry was in a downward spiral by the first quarter of 1983. As of February 28, 1983, it appeared unlikely that day rates would be higher than they were in 1981 for the foreseeable future. It was therefore unlikely that payments to Allied Bank could be made as required. The original agreement was for InterMarine's loan from Allied Bank to be repaid in 19 quarterly payments (5 years) beginning May 1982.

After examining all of the evidence, we believe that pursuit of collection in February 1983 would have been fruitless. We conclude that petitioners have proven that the $11 million subordinated note was worthless as of February 28, 1983.

Subsequent events may be used to evaluate the soundness of the belief that a debt became worthless in a certain year, but not as evidence of the fact of worthlessness. *Estate of Mann v. Commissioner*, 731 F.2d at 277 (citing 5 J. Mertens, Law of Federal Taxation sec. 30.37 (1980)). As of 1989, InterMarine had not made any payments on the subordinated note which was due on May 31, 1987. The senior note to Allied Bank which was to have been repaid by May 31, 1987, had an outstanding principal balance greater than $9 million in September 1989.

## 2. *Disposition of Installment Obligation Under Section 453B*

Respondent argues that petitioners' bad debt deduction is barred by section 453B(a) on the grounds that there has been no disposition of the installment obligation. We will also consider whether petitioners' bad debt deduction is barred by section 453B(f) on the grounds that the installment obligation has not become unenforceable or been canceled.

a. *Background*

Generally, under the installment method, recognition of income from a sale of property is deferred until the payments are received. The amount of income recognized in a taxable year is that proportion of the payments received in that year which the gross profit bears to the total contract price. Sec. 453(c).

Legislative history accompanying revision of the installment method in 1980 states:

> The function of the installment method of reporting income is to permit the spreading of the income tax over the period during which payments of the sales price are received. Thus, the installment method alleviates possible liquidity problems which might arise from the bunching of gain in the year of sale when a portion of the selling price has not been actually received.

H. Rept. 96-1042, at 5 (1980); identical language appears at S. Rept. 96-1000, at 7 (1980), 1980-2 C.B. 494, 497.

b. *Section 453B(a)*

In certain circumstances the deferral of recognition of income provided by the installment method ceases. For example, under section 453B(a) no gain or loss is recognized until there is a disposition of the installment obligation.

Section 453B(a) provides:

> SEC. 453B(a). GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—
>
> (1) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or
>
> (2) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

Section 453B(a) was first enacted as section 44(d) of the Revenue Act of 1928, ch. 852, tit. I, 45 Stat. 791, 806 (hereafter section 44(d) of the 1928 Act). Before the Revenue Act of 1928, the disposition of an installment obligation

provided the potential for tax avoidance abuse. For example, in a case decided under the Revenue Act of 1926, ch. 27, 44 Stat. 9, a taxpayer reported income on the installment method and assigned the notes receivable to his daughter. The transaction was held to be tax-free. *Huntington v. Commissioner*, 15 B.T.A. 851 (1929); see also *Milan v. Commissioner*, 16 B.T.A. 1112 (1929). The legislative history of section 44(d) of the 1928 Act states that it was enacted to stop tax avoidance through the disposition of installment obligations. The House Ways and Means Committee report states:

subsection (d) contains new provisions of law to prevent evasion of taxes in connection with the transmission of installment obligations upon death, their distribution by way of liquidating or other dividends, or their disposition by way of gift, or in connection with similar transactions. * * * To prevent the evasion the subsection terminates the privilege of longer deferring the profit if the seller at any time transmits, distributes, or disposes of the installment obligations and compels the seller at that time to report the deferred profits. * * *

H. Rept. 2, 70th Cong., 1st Sess. (1927), 1939-1 C.B. (Part 2) 384, 393-395; identical language appears at S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939-1 C.B. (Part 2) 409, 424-426.

### c. *Section 453B(f)*

Section 453B(f) treats cancellation of an installment obligation as a disposition. It provides that an installment obligation will be treated as if disposed of if it is canceled or otherwise becomes unenforceable.

Section 453B(f) provides:

SEC. 453B(f). OBLIGATION BECOMES UNENFORCEABLE.—For purposes of this section, if any installment obligation is cancelled or otherwise becomes unenforceable—

(1) the obligation shall be treated as if it were disposed of in a transaction other than a sale or exchange, and

(2) if the obligor and obligee are related persons (within the meaning of section 453(f)(1)), the fair market value of the obligation shall be treated as not less than its face amount.

Section 453B(f) was included in the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, 2253,

to preclude circumvention of the installment obligation disposition rules by canceling the obligation. S. Rept. 96-1000, at 26, 1980-2 C.B. at 507-508; H. Rept. 96-1042, at 21-22.

The legislative history shows that section 453B(f) was enacted to eliminate a possible abuse based on *Miller v. Usry,* 160 F. Supp. 368 (W.D. La. 1958). The Senate Finance Committee report states:

M. Cancellation of Installment Obligation (Sec. 2 of the bill and new sec. 453B(f) of the Code)

Present Law

Under present law, some have argued that the installment obligation disposition rules can be avoided by making gift cancellations of the obligation or the installments as they come due. In other words, by making an installment sale and then cancelling the obligation or a number of installment payments, it is argued that the seller will incur no income tax liability, but possibly some gift taxes, and the buyer will have a cost basis in the property sold although no income tax cost will have been incurred on the transaction. If a direct gift is made, the donee's basis is generally the same as the donor's basis rather than a "cost" basis which reflects future payments which will never be made.

This cancellation technique is based on a District Court's decision in *Miller v. Usry.* [Fn. ref. omitted.] In that case, the court held that the disposition rules for obligations disposed of other than by sale or exchange were directed at corporate transfers and should not be applied to a cancellation of the obligation where there has been no actual, real, or material gain to the taxpayer. The court did not consider the possible benefit to the donee from acquiring a cost basis through the installment sale. Next, the court held that the disposition rules for satisfaction at other than face value did apply to a cancellation but no tax was incurred because no amount was realized by the taxpayer.

Reasons for Change

The committee believes that present law should be clarified to make it clear that the installment obligation disposition rules cannot be circumvented by cancelling the obligation.

Explanation of Provision

The bill makes it clear that the cancellation of an installment obligation is treated as a disposition of the obligation. In the case where the obligor is a related party, the amount taken into account as a disposition triggering recognition of unreported gain attributable to the obligation is not to be less than the face amount of the installment obligation.

[S. Rept. 96-1000, at 26, 1980-2 C.B. at 507-508; H. Rept. 96-1042, at 21-22.]

d. *Discussion*

As stated, respondent argues petitioners' bad debt deduction under section 166 is barred by section 453B(a) because there has been no disposition of the installment obligation. We disagree. We conclude that neither section 453B(a) nor section 453B(f) bars petitioners' bad debt deduction here.

Neither section 166 nor sections 453 and 453B explicitly state their relationship to the other. Section 166 applies to "any debt" that becomes worthless within the taxable year. Sec. 166(a)(1). Respondent agrees that the subordinated note at issue here is a debt. We are aware of no legislative or judicial history that indicates section 453B(a) bars a bad debt deduction under section 166. We think respondent's argument that section 453B(a) bars a bad debt deduction under section 166 applies section 453B(a) out of its context and in a way Congress gave no indication it ever considered.

Respondent argues that as a matter of statutory interpretation, specific statutes govern the outcome even in the presence of other more general statutes which might lead to the opposite result. 73 Am. Jur. 2d, Statutes, sec. 257 (1974). Respondent's theory is that section 453B is more specific than section 166 and therefore section 453B applies. We do not find this argument convincing in this context.

Respondent argues that petitioner has not disposed of the installment obligation for purposes of section 453B(a). However, in light of our analysis, we need not decide this issue. Similarly, we need not decide whether petitioners' subordinated note is canceled or is otherwise unenforceable for purposes of section 453B(f).

In light of the foregoing, we conclude that the deduction of a bad debt under section 166 is not precluded by section 453B(a) or (f).

3. *Transfers of Funds as Debt or Equity*

Petitioners Operators and ZOI transferred funds to Offshore Machinery to be used to repay transfers to outside creditors. Operators and ZOI deducted the amounts transferred to Offshore Machinery as bad debts on returns for periods ending in 1983. Respondent disallowed the deductions on grounds that the transfers were equity rather than

debt. Petitioners argue that the transfers were debt. The Fifth Circuit, to which this case would be appealable, has held that characterization of transfers of this type is a question of law. *Texas Farm Bureau v. United States,* 725 F.2d 307, 311-312 (5th Cir. 1984); *Estate of Mixon v. United States,* 464 F.2d 394, 402 (5th Cir. 1972).

Before a bad debt deduction may be taken under section 166, the taxpayer must establish the validity of the debt. *Kean v. Commissioner,* 91 T.C. 575, 594 (1988); *Electric & Neon, Inc. v. Commissioner,* 56 T.C. 1324, 1338-1339 (1971), affd. without published opinion, affd. without published opinion sub nom. *Jiminez v. Commissioner,* 496 F.2d 876 (5th Cir. 1974); *C.M. Gooch Lumber Sales Co. v. Commissioner,* 49 T.C. 649, 656 (1968).

The Fifth Circuit has identified 13 factors to be analyzed in deciding whether transferred funds are equity or debt. *Estate of Mixon v. United States, supra* at 402. No one factor controls in characterizing the transfer of funds as debt or equity, *Estate of Mixon v. United States, supra* at 402, and they are not the only factors applicable to this issue. *Estate of Mixon v. United States, supra* at 402 n.12.

We next apply the 13 factors to this case.

*Factor 1. Name given to the certificate evidencing the indebtedness.* There is no formal certificate here. Accordingly, we view this factor to be neutral toward proving debt or equity.

*Factor 2. Presence or absence of a maturity date.* There were no fixed maturity dates or dates of repayment. Instead, they were open accounts. The absence of a fixed maturity date indicates that repayment is more likely to be tied to the fortunes of the business, which indicates an equity advance. *Estate of Mixon v. United States, supra* at 404. Petitioners concede that this factor points toward equity.

*Factor 3. The source of the payments.* If repayment is possible only out of corporate earnings, the transaction appears to be a contribution of equity capital, but if repayment is not dependent upon earnings, the transaction has an indication of being a loan to the corporation. *Estate of Mixon v. United States, supra* at 405.

An examination of Offshore Machinery balance sheets and income statements for 1980 through 1983 shows repayment to be dependent upon earnings. From 1980 through 1982 Offshore Machinery showed losses from operations and a steadily reducing inventory and total assets. Repayment appears to be anticipated only when Offshore Machinery is financially capable, thus there is no reliable return. *Segel v. Commissioner,* 89 T.C. 816, 830 (1987). A true lender seeks a more reliable return when it puts money at the risk of the debtor's business. *Slappey Drive Industrial Park v. United States,* 561 F.2d 572, 581 (5th Cir. 1977). There is no evidence of any security interest or other guarantees. This factor points to equity.

*Factor 4. Right to enforce repayment.* A definite obligation to repay the advance is an indicia of a loan. *Estate of Mixon v. United States, supra* at 405. See *Campbell v. Carter Foundation Production Co.,* 322 F.2d 827, 832 (5th Cir. 1963). We are unconvinced that a definite obligation to repay existed. This factor points toward equity.

*Factor 5. Participation increase in management.* If, as a result of an advance of funds, the creditor has an increased right to participate in the management of the entity which received them, then it participates as a shareholder rather than as a bona fide creditor. *Estate of Mixon v. United States, supra* at 406.

There is no evidence in the record of any increased right to participate in management by those advancing the funds. However, an increase in participation in management as a result of nonpayment could not occur because the same group managed all of petitioners and Offshore Machinery. Thus, we treat this factor as neutral.

*Factor 6. Subordination.* Whether the advance has a status equal to or inferior to that of regular corporate creditors bears on whether the taxpayer was dealing as a shareholder or a creditor. *Estate of Mixon v. United States, supra* at 406. Failure to demand timely repayment effectively subordinates the intercompany debt to the rights of other creditors who receive payment in the interim. *Inductotherm Industries, Inc. v. Commissioner,* T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985). There is no evidence of such a demand here.

Moreover, the transferred funds were used to repay loans to outside creditors. Petitioners concede that this factor is unfavorable to them.

*Factor 7. Intent of the parties.* Witnesses for petitioners testified that the intent of the parties was that the transactions were to be loans. However, these statements are not sufficiently corroborated by objective evidence to convince us that the intent was as stated. *Tyler v. Tomlinson,* 414 F.2d 844, 850 (5th Cir. 1969). Here, corporate paper or written formalities are nonexistent. Accounting and tax records characterized the transactions as loans; however, most of the other factors point toward equity. Petitioners have not persuaded us that this factor points toward debt.

*Factor 8. Thin or adequate capitalization.* Thin capitalization is very strong evidence of a capital contribution where: (1) The debt to equity ratio was initially high, (2) the parties realized that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations. *United States v. Henderson,* 375 F.2d 36, 40 (5th Cir. 1967).

Petitioners concede that capitalization was thin. Immediately before Operators and ZOI transferred $800,000 to Offshore Machinery, the debt to equity ratio was no better than 800 to 1. There were no assets remaining for potential collection remedies.

Petitioners argue that the reason for small capital was that Offshore Machinery did most of its business with other petitioners and that many other bigger companies were having trouble borrowing money during those times. Notwithstanding these facts, we believe this factor is indicative of equity.

*Factor 9. Identity of interest between creditor and stockholder.* If advances by stockholders are in proportion to their respective stock ownership, an equity capital contribution is indicated. *Estate of Mixon v. United States, supra* at 409; *Tomlinson v. 1661 Corporation,* 377 F.2d 291 (5th Cir. 1967). On the other hand, a sharply disproportionate ratio between a stockholder's percentage stockholdings and debt is strongly indicative that the debt is bona fide. *Tyler v.*

*Tomlinson, supra; Leach Corp. v. Commissioner,* 30 T.C. 563, 579 (1958). See *Charter Wire, Inc. v. United States,* 309 F.2d 878, 880-881 (7th Cir. 1962).

Operators was a wholly owned subsidiary of AVI before AVI's liquidation in February 1983. Albaral and Hennessy each owned 50 percent of the stock of AVI and 12.5 percent of the stock in ZOI. The remaining 75 percent of ZOI was split equally between Caspary and Wendell. Each of the four shareholders owned 25 percent of the stock of Offshore Machinery. Thus, all of the stock of the corporations involved in these transactions was owned by four individuals. Petitioners argue, and we agree, that there was no exact identity of interest between the creditors and stockholders. However, it is clear that only four individuals owned all of the stock of the parties to the transactions. The entities did much business with each other. The funds that were transferred were in some but not exact proportion to stockholdings. This factor points more toward equity than debt.

*Factor 10. Payment of interest only out of dividend money.* There were no interest payments, no provision for interest payments, and no apparent source for them. A true lender is concerned with interest. *Estate of Mixon v. United States, supra* at 409 (citing *Curry v. United States,* 396 F.2d 630, 634 (5th Cir. 1968). See also *National Carbide Corp. v. Commissioner,* 336 U.S. 422, 435 n.16 (1949)). The failure to insist on interest payments indicates that the payors are not expecting substantial interest income, but are more interested in the future earnings of the corporation or the increased market value of their interest. *Curry v. United States, supra.* This factor points to equity.

*Factor 11. Ability to obtain loans from outside lending institutions.* If a corporation can borrow funds from an outside source when a transfer of funds is made, the transaction appears as bona fide debt. *Estate of Mixon v. United States, supra* at 410; *Tomlinson v. 1661 Corp., supra.* While there is no evidence of any unsuccessful attempts to obtain further outside financing, we believe it is because Offshore Machinery had little ability to do so. Therefore, we are not convinced that this factor indicates that the transfers of funds were debt. However, because it was very

difficult to obtain financing at the time, we do not give this factor much weight.

*Factor 12. The extent to which the advance was used to acquire capital assets.* The transfers of funds were primarily used to repay debts to outside lenders rather than to provide capital for day-to-day operations or to acquire capital assets. Accordingly, we give this factor little weight.

*Factor 13. The failure of the corporation to repay on the due date.* Petitioners argue that Operators and ZOI had a long history of lending funds on open account to Offshore Machinery. However, between 1976 and 1983, ZOI advanced to Offshore Machinery $455,518 and received in repayment $3,386.40. Here, there were no due dates. This repayment record is hardly justification for a lender to forgo a fixed repayment schedule.

In light of the foregoing, we hold that the transfers of funds by Operators and ZOI to Offshore Machinery were equity and thus not deductible as bad debts for taxable years ending in 1983.

Due to concessions and to reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, KÖRNER, SHIELDS, CLAPP, SWIFT, GERBER, WRIGHT, PARR, WELLS, WHALEN, HALPERN, and BEGHE, *JJ.*, agree with this opinion.

NIMS and COHEN, *JJ.*, concur in the result only.

JACOBS, *J.*, did not participate in the consideration of this opinion.