T.C. Memo. 1998-133

UNITED STATES TAX COURT

KENNETH R. AND CAROL L. BAUER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26285-96.                    Filed April 6, 1998.

Kenneth R. and Carol L. Bauer, pro se.

<u>J. Scott Hargis</u>, for respondent.

MEMORANDUM OPINION

NAMEROFF, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7443A(b)(3)[1] and Rules 180, 181, and 182.  Respondent determined a deficiency in petitioners' 1993 Federal income tax in the amount of $2,916.  The issue for

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

decision is whether petitioners are entitled to a nonbusiness bad debt deduction pursuant to section 166.

## Background

Some of the facts have been stipulated, and they are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Mr. Bauer resided in Riverside, California, and Mrs. Bauer resided in Laughlin, Nevada, at the time they filed their petition.

Mrs. Bauer is a real estate broker. Mr. Bauer is a machinist. During the year at issue, Mr. Bauer spent his weekends with Mrs. Bauer in Laughlin, Nevada, and in Bullhead City, Arizona, a town located directly across the Colorado River from Laughlin.

Petitioners, but especially Mrs. Bauer, frequently dined at a restaurant in Bullhead City named The Diamond Lil's Drunken Lobster (the Drunken Lobster). The Drunken Lobster was an upscale restaurant specializing in steak and lobster that opened in 1990. The Drunken Lobster was owned and operated by father and son, Salvatore and John Dubato (John) (collectively referred to as the Dubatos), who also were petitioners' personal friends.

During 1991, the Drunken Lobster was having financial problems. The Dubatos approached petitioners for a loan, and petitioners decided to advance them funds for use in their business. Petitioners made a series of four interest-free loans

to the Dubatos.[2] Within the time promised (i.e., 30 or 60 days), the Dubatos repaid petitioners the full amount of each loan. Petitioners made the loans because they wanted to help their friends and because Mrs. Bauer wanted a nice restaurant close by to which she could take her real estate clients. Petitioners, however, were not in the business of lending money.

During 1992, the Dubatos continued having financial problems. Through a series of nine payments, petitioners advanced a total of $10,901.39 to, or on behalf of, the Dubatos between the months of March and August 1992.[3] These advances were not supported by written loan documents. Petitioners expected to be repaid within 30 to 60 days and to receive an annual interest rate of 15 percent.

---

[2] The first of these loans was for $500, to be repaid within 30 days.

[3] Petitioners made the following advances during 1992:

| Date | Amount | Form and Purpose of Payment |
|------|--------|------------------------------|
| March 16 | $2,000.00 | Cash to cover payroll |
| March 28 | 2,800.00 | Rent check to Hesling Fam. Trust |
| April 22 | 866.62 | Cashier's check for insurance |
| May 22 | 2,000.00 | Cashier's check for supplies |
| May 22 | 2,000.00 | Cashier's check for supplies |
| April/May | 462.00 | Check to publications for adver. |
| May/June | 115.67 | Check to florist for decorations |
| June/July | 477.10 | Check to publications for adver. |
| August | 180.00 | Check to publications for adver. |
| Total | 10,901.39 | |

After the initial advance was made in March 1992, John orally promised to either repay petitioners within a month or else transfer to them a 15-percent interest in the Drunken Lobster. John did not fulfill his promise. In May or June 1992, John again orally promised to repay petitioners in one of three ways: (1) Full cash repayment by May 1993; (2) the transfer of an interest in the restaurant in lieu of payment; or (3) payment through an installment plan of $500 per month, plus interest. John never fulfilled his promise, and the Dubatos never repaid petitioners for any portion of these advances. Moreover, petitioners did not receive an equity interest in the Drunken Lobster.

While the Drunken Lobster started out successfully, the excitement of a new restaurant in the area quickly wore off. The Drunken Lobster was no longer attracting the customers it once did. Although it was consistently crowded for breakfast, the lunch crowd was starting "to slack off a little bit" and the dinner hour no longer had a waiting list. Beginning in April 1992, Mrs. Bauer did what she could to assist the Dubatos and even performed work for the Drunken Lobster when it was short staffed. She created advertisements, wrote and printed menus, organized holiday events (i.e., a Mother's Day and a July 4th holiday meal), and cleared and bused tables. Mrs. Bauer was not compensated for her time or reimbursed for her expenditures.

By the end of May 1992, petitioners began to suspect that the Dubatos were having serious financial problems because they started "letting people go" and because they were not meeting many of their expenses.  At that point, Mrs. Bauer went to Drunken Lobster once a week, not so much to assist, but to "bug" the Dubatos for payment.  Petitioners offered to accept $500 every other week, without interest, if the Dubatos would just start paying them back.  The Dubatos, offering only excuses, did not agree with that arrangement.

Throughout 1993, the Drunken Lobster ran on a skeleton budget and crew.  In fact, there were days that the Drunken Lobster did not open.  The Dubatos permanently closed the Drunken Lobster in October 1993.  At no time during 1993, did petitioners advance the Dubatos additional funds, despite the fact that the Dubatos requested them to do so.

Petitioners did not take legal steps to collect on the debts (other than possibly writing one demand letter) because the Dubatos had no assets from which to satisfy their debts. Petitioners' personal observations of the Dubatos' financial situation revealed that they owned no assets outright and that they had leased everything, including the three-bedroom house in which they lived, the premises where the Drunken Lobster was located, and all the Drunken Lobster's property and equipment (i.e., kitchen equipment, tables, chairs, tablecloths,

silverware, and dishes). Petitioners were aware that other creditors of the Dubatos were also dunning them for payment. This included a meat supplier, a food supplier, and a State revenue officer who, Mrs. Bauer saw, "came in and took the money right out of the drawer for sales tax". The Dubatos continued living in Bullhead City for some part of 1994, but later on during the year, they eventually moved. At the time of trial, petitioners were unaware of the Dubatos' whereabouts.

On their 1993 Federal income tax return, petitioners claimed a $10,901 business bad debt deduction. In the notice of deficiency, respondent, inter alia, disallowed the bad debt deduction. At trial, petitioners conceded that their advances were nonbusiness debts, and they now seek only a nonbusiness bad debt deduction. All other adjustments in the notice of deficiency have been resolved.

## Discussion

The Commissioner's determinations are presumed correct, and petitioners bear the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 166(a) permits a deduction for any bona fide debt that becomes worthless within the taxable year. To qualify for the bad debt deduction, there must be a debtor-creditor relationship. Sec. 1.166-1(c), Income Tax Regs. Whether a bona

fide debtor-creditor relationship exists is a question of fact which ultimately requires a determination as to whether there was a genuine intention to create a debt, with reasonable expectation of repayment, and whether that intent comports with the economic reality of creating a debtor-creditor relationship. Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973); see also A.R. Lantz Co. v. United States, 424 F.2d 1330, 1334 (9th Cir. 1970); Fisher v. Commissioner, 54 T.C. 905, 909 (1970). There is no standard test or formula for determining worthlessness within a given taxable year; the determination depends upon the particular facts and circumstances of the case. Crown v. Commissioner, 77 T.C. 582, 598 (1981). Generally, however, the year of worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery. United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398 (1927); American Offshore, Inc. v. Commissioner, 97 T.C. 579, 593 (1991); Crown v. Commissioner, supra. Moreover, a debt will generally be considered worthless only when it can be reasonably expected that the debt is without possibility of future payment and legal action to enforce the debt would not result in satisfaction. Hawkins v. Commissioner, 20 T.C. 1069 (1953); sec. 1.166-2(b), Income Tax Regs.

Respondent asserts that petitioners are not entitled to a bad debt deduction because: (1) Petitioners have failed to

establish that their advances were bona fide debts as opposed to gifts; and (2) assuming the Court finds the existence of bona fide debt, the debt did not become worthless during 1993. Petitioners, on the other hand, contend that the debt became worthless during 1993, thereby entitling them to a deduction.

Upon review of the record, we hold that petitioners are entitled to a nonbusiness bad debt deduction for 1993. The record demonstrates that there was a bona fide debtor-creditor relationship between petitioners and the Dubatos. While petitioners' nine payments to, or on behalf of, the Dubatos were not supported by notes or other physical evidence of indebtedness, we are convinced that petitioners intended them to be loans for which they reasonably expected repayment. Petitioners advanced the $10,901.36 only after they were timely and fully repaid by the Dubatos on their four previous loans. Moreover, the Dubatos had an operating business from which petitioners could reasonably expect repayment. Lastly, petitioners expected to receive interest and made numerous demands for payments once the Dubatos failed to timely repay the loans. These facts suggest that a bona fide debtor-creditor relationship existed. Respondent's contention that the advances were gifts to Dubatos is simply not supported by the record.

We also find that the debt became worthless in 1993.

We believe that identifiable events, occurring in 1993, formed a reasonable basis for petitioners to abandon all hope of recovery during that year.  It was during 1993 that the Drunken Lobster ran on a skeleton crew and permanently ceased its operations. Although the Dubatos were having financial problems during 1992, it was not until the closure of the Drunken Lobster that the Dubatos' means with which to repay petitioners were eliminated. The Dubatos had no other assets from which petitioners could collect on their debts.  Moreover, there is sufficient evidence for us to find that legal action to enforce payment would be futile.  Accordingly, petitioners are entitled to a nonbusiness bad debt deduction for 1993.[4]

     To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.

---

[4]  We note that a nonbusiness bad debt deduction is treated as a short-term capital loss subject to the capital loss limitation of sec. 1211(b).  Sec. 166(d); sec. 1.166-5(a)(2), Income Tax Regs.  Sec. 1211(b) restricts petitioners' deduction to the extent of their capital gains plus (if losses from sales or exchanges of capital assets exceed such gains) the lesser of $3,000 or the excess of such losses over such gains. Petitioners, however, are permitted to carry over any capital loss in excess of this amount to the succeeding taxable year. Sec. 1212(b).