T.C. Summary Opinion 2004-132


UNITED STATES TAX COURT


JEAN I. TEDFORD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4754-03S.          Filed September 22, 2004.


<u>Ernesto Pineda</u>, for petitioner.

<u>Sheila R. Pattison</u>, for respondent.


HAINES, <u>Judge</u>:  This case was heard pursuant to section 7463 in effect at the time the petition was filed.[1]  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code for the relevant year, and all Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

Respondent determined the following deficiencies and addition to tax in petitioner's Federal income taxes:

| Year | Deficiency | Addition to Tax I.R.C. § 6651(a)(1) |
|------|-----------|-------------------------------------|
| 1998 | $10,446 | |
| 1999 | $12,345 | $3,089 |
| 2000 | $ 1,661 | |

After concessions by the parties, the issue for decision is whether the monetary transfers that petitioner and her deceased husband made to a corporation are capital contributions or bona fide debts that are deductible as business bad debts under section 166.[2]

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioner resided in El Paso, Texas.

Petitioner, Jean I. Tedford, married J.C. Tedford (Mr. Tedford) in 1964. They were married until Mr. Tedford's death. Throughout their marriage, Mr. Tedford and petitioner resided in El Paso, Texas. Mr. Tedford was born on April 29, 1919. Petitioner was born on July 27, 1929.

---

[2] Petitioner concedes that she is liable for an addition to tax under sec. 6651(a)(1) for 1999.

In 1977, Mr. Tedford organized Border Pre-Cast Concrete, Inc. (Border), a Texas corporation. Border was in the business of construction. Since Border's incorporation, Mr. Tedford and petitioner leased to Border all the real estate that Border used for its business operations, including the corporate offices, plant facilities, and storage yard. At various times, Mr. Tedford and petitioner also leased equipment to Border. Before 1994, Mr. Tedford and petitioner made capital investments in Border totaling $180,000.

Mr. Tedford was the president and sole shareholder of Border. He was the key employee of Border and was responsible for managing the business. He was generally in the office by 6 a.m. He would work through the lunch hour and did not leave for home until after 6 p.m. He worked at least half days on the weekends and also took work home with him. Mr. Tedford enjoyed his work and took great pride in managing Border. He received several awards and other forms of recognition for construction jobs performed by Border. Despite being in his mid-seventies and having had previous heart attacks and a coronary bypass, Mr. Tedford had no desire to retire.

Petitioner was the vice president of Border. Petitioner's job duties consisted of answering the telephone, signing checks, and driving Mr. Tedford around when his health started to fail.

Border paid officer's compensation to Mr. Tedford and petitioner during many of its fiscal years ending August 31, 1979, to August 31, 1993. The amount of officer's compensation that Mr. Tedford and petitioner received varied greatly in the years it was paid.

Mr. Tedford and petitioner's daughter, Deborah Williams (Ms. Williams), was also employed by Border. Ms. Williams started taking care of general office duties and payroll for Border in 1988. Over time Ms. Williams took on more duties, including assisting Mr. Tedford with personal activities. In 1994, Ms. Williams became Border's office manager and Mr. Tedford's personal assistant. As office manager, Ms. Williams was in charge of billing and collection, keeping track of Border's bank account, and keeping track of the monetary transfers Mr. Tedford made to Border.

James D. Edge (Mr. Edge) became Mr. Tedford and petitioner's C.P.A. in 1993 and became Border's C.P.A. in 1994. Mr. Edge prepared Border's Federal income tax returns for fiscal years 1994-97. He also prepared petitioner's Federal income tax returns for 1993-2000. Before Mr. Edge's involvement, another C.P.A. assisted Mr. Tedford, petitioner, and Border with tax and accounting matters. Mr. Edge is not a certified appraiser or an appraisal expert.

He is also not an expert on construction equipment or auctions. Mr. Edge was not designated as an expert witness for this case.

Border obtained a line of credit from SunWest Bank of El Paso (SunWest) to help with the operation of its business. SunWest held a security interest in all of Border's assets in addition to property owned by Mr. Tedford and petitioner.

When Border started having cashflow problems Mr. Tedford tried to get more loans from SunWest. SunWest notified Mr. Tedford that it would not lend additional funds to Border until previous loans were paid. Mr. Tedford tried to convince SunWest to release either some of Border's collateral or his and petitioner's collateral so that loans could be sought from other sources, but SunWest also refused this request.

When Mr. Tedford was unable to acquire additional loans Mr. Edge suggested that Mr. Tedford consider liquidating Border. Mr. Tedford wanted to continue working, however, and rejected Mr. Edge's suggestion. When Mr. Tedford decided to use personal finances to aid Border, Mr. Edge advised Mr. Tedford to make loans to Border instead of capital investments.

In addition to using his own money, Mr. Tedford asked petitioner to lend money to Border. Petitioner was hesitant when Mr. Tedford first approached her with the idea because she knew Border was struggling financially. Petitioner, however, believed

Mr. Tedford would repay her, so she decided to let him borrow the money.

In 1994, Mr. Tedford began using his and petitioner's personal funds to transfer sums to Border and pay some of Border's business expenses.  Border used the sums transferred by Mr. Tedford and petitioner to buy supplies and equipment and to make loan payments to SunWest.

On January 12, 1994, Mr. Tedford transferred $90,000 to Border out of the cash-surrender moneys available on two personal insurance policies.  The transfer is evidenced by a letter from U.S. Life Insurance Services Corporation (U.S. Life letter), dated December 21, 1993.  Attached to the front page of the letter is a handwritten "Post-it" note that states, "Border owe [sic] J.C. Tedford - to be paid over 6 mos. at 8% int."  Stapled to the letter are copies of two checks totaling $90,000, both dated January 12, 1994, a blank page entitled "Demand Note," and copies of the backs and fronts of the same two checks with endorsements.  On the back of the correspondence is a stamp that reads "Deposited to the Credit of ck#6004210-9002, Endorsement Guaranteed, SunWest Bank of El Paso", signed by the vice president of SunWest, and also signed by Mr. Tedford.  This transfer is also evidenced in Border journal entry no. JE0106, posted on January 25, 1994, by Lucy Salas, Border's bookkeeper at the time, in the Corporate accounting records of Border.  The

corporate journal entry states "Borrowed from J.C. Tedford Life Insurance" in the sum of $90,000.  However, the $90,000 transfer was originally booked as a debit to notes payable and a credit to preferred stock.

On April 8, 1994, Mr. Tedford signed a document entitled "Demand Note" on behalf of Border.  The demand note is printed on Border letterhead, made payable to the order of J.C. Tedford in the principal sum of $15,000, bearing interest at the rate of 6 percent per annum.  The space behind "Interest payable," where the date interest is payable is to be inserted, is blank.  A copy of a check signed by Mr. Tedford, dated April 8, 1994, is stapled to the demand note.  The check is made payable to the order of Border and has the word "Loan" written on it in Mr. Tedford's handwriting.  This transfer of money was entered into Border's "Aged Accounts Payable by Vendor."

On April 15, 1994, Mr. Tedford prepared another demand note on behalf of Border, in the principal sum of $15,000, bearing interest at the rate of 6 percent per annum.  The space behind "Interest payable" where the date interest is payable is to be inserted, is blank.  The demand note is unsigned, but attached to it is a copy of a check dated April 15, 1994, made payable to Border for $15,000.  The check is handwritten and signed by Mr. Tedford with the word "Loan" written on it.

In addition to the above transfers, various checks were prepared and signed by Mr. Tedford. The word "Loan" was written on the checks. Some of the checks were written directly to Border while others were written to third parties to pay Border's business expenses. Petitioner claims that other demand notes had been created for the transfers Mr. Tedford and petitioner made to Border. Petitioner also claims that the business and accounting records of Border were stored in various locations in El Paso, Texas, and Las Cruces, New Mexico, and that it was very difficult to locate and review these records as several of them had been lost or destroyed.

Mr. Tedford met with Ms. Williams and Mr. Edge, and instructed them concerning which advances from his personal accounts constituted loans to Border. Ms. Williams summarized these checks and provided a summary of the loans along with copies of the checks to Mr. Edge. Mr. Tedford also instructed the in-house accountant that these transactions were to be reported as shareholder loans on the accounting books of Border. Mr. Edge reported these transactions as loans on the accounting records of Border and Forms 1120, U.S. Corporate Income Tax Returns, of Border for 1994-96. Formal loan documents were not executed for most of the transfers.

Mr. Tedford and petitioner prepared a personal financial statement, dated July 31, 1994, to obtain a business loan from

the U.S. Small Business Administration.  On page two of the application, Mr. Tedford and petitioner listed loans due to them from Border in the sum of $168,000 as an "Other Asset".

In Border's financial statement for Border's fiscal year ending on August 31, 1995, the balance sheet of Border shows an item entitled "Long-term debt, shareholder $243,223", and the footnotes on page 10, item 10 of the corporate financial statement further disclose and discuss the shareholder loans to Border in the sum of $243,223.

Border did not report any loans from shareholders on its Form 1120 for the fiscal year ending August 31, 1994.  However, on its Form 1120 for the fiscal year ending August 31, 1995, Border reported loans from shareholder of $243,223.

Border made no payments to Mr. Tedford and petitioner for the amounts they transferred to the corporation.  However, when it was discovered that one of the transfers Mr. Tedford and petitioner made had overpaid an invoice by $17,035, the overpayment was returned to Mr. Tedford and petitioner. Petitioner claimed the loans were consequently reduced from $243,223 to $226,188.

No security was given for the sums Mr. Tedford transferred and the expenses he paid for Border in 1994-95.  Before Mr. Tedford's death, he and petitioner did not seek repayment of the

sums they transferred to Border.  Interest was not charged or paid on the amounts petitioner claims are loans to Border.

Mr. Tedford suffered a heart attack and died on October 6, 1995.  Pursuant to the terms of Mr. Tedford's will, petitioner was the sole beneficiary and was appointed the Independent Executrix of Mr. Tedford's estate.

On November 29, 1995, all of the death benefits of Mr. Tedford's personal life insurance policies were paid to SunWest Bank in the sum of $98,290, as SunWest had required the life insurance as additional collateral on the working capital loan that it had made Border.

Border ceased operation after Mr. Tedford passed away. Border sold its assets at an auction on June 20, 1996, to pay company debts, but continued its efforts to collect its accounts receivable.  The gross total for the items sold at auction was $311,690.

On its 1996 Form 1120 Border reported $218,489, as income from forgiveness of indebtedness.

Petitioner filed her 1997 Form 1040, U.S. Individual Income Tax Return, on May 25, 1998.  Petitioner did not claim any business bad debt loss related to Border on her 1997 Form 1040.

In October 1999, petitioner filed a Form 1040X, Amended U.S. Individual Income Tax Return for 1997.  On that return petitioner reported, in part, (1) a business bad debt loss of $218,489 from

claimed loans made to Border and (2) a $180,000 stock loss from a worthless investment in Border.  On Form 1040X, petitioner requested section 1244 treatment of the stock loss.  Petitioner carried the remaining claimed 1997 business bad debt loss back to 1994-96 and forward into the years at issue, 1998-2000.

On December 26, 2002, respondent mailed to petitioner a notice of deficiency for 1998-2000.  Respondent did not challenge the total amount of the transfers of money as claimed on petitioner's returns.  Respondent did however, disallow petitioner's ordinary loss treatment of the alleged business bad debt and instead allowed petitioner the $218,489 as a capital loss.  Respondent also allowed the $180,000 stock loss for 1997 for the capital investments petitioner and Mr. Tedford had made prior to 1994.

On March 25, 2003, petitioner filed a petition for redetermination with the Court.

## Discussion

The issue is whether the monetary transfers that petitioner and her deceased husband made to Border are capital contributions or bona fide debts under section 166.

Under section 166(a) a taxpayer may deduct bona fide debts owed to her that become worthless within the taxable year.  Bona fide debts are debts which arise from debtor-creditor relationships that are based upon valid and enforceable

obligations to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. A gift or contribution to capital does not constitute bona fide debt for the purposes of section 166. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 284 (1990); Kean v. Commissioner, 91 T.C. 575, 594 (1988); Sec. 1.166-1(c), Income Tax Regs.

The taxpayer bears the burden of showing entitlement to deductions and must show that bona fide debt existed and that the debt became worthless in the year claimed. Rule 142(a); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).

Whether a transfer of funds from a shareholder to a corporation constitutes bona fide debt is a question of fact which must be decided on the basis of all the relevant facts and circumstances in each case. Calumet Indus., Inc. v. Commissioner, supra at 285; Dixie Dairies Corp. v. Commissioner, supra at 493; Ga.-Pac. Corp. v. Commissioner, 63 T.C. 790, 795 (1975). Factors ordinarily considered include, but are not limited to: (1) The names given to the documents that evidence the purported loans; (2) the presence or absence of fixed maturity dates with regard to the purported loans; (3) the likely source of any repayments; (4) whether the taxpayer could or would enforce repayment of the transfers; (5) any increase in management participation as a result of the transfers; (6) the status of the transfers in relation to debts owed to regular

corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) the identity of interest between creditor and shareholder; (10) the source of interest payments; (11) the ability to obtain loans from outside lending institutions; (12) the use of funds by the corporation; and (13) the failure of the corporation to repay on the due date.  Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 602-606 (1991); see also Tex. Farm Bureau v. United States, 725 F.2d 307, 311 (5th Cir. 1984); Calumet Indus., Inc. v. Commissioner, supra at 285; Dixie Dairies Corp. v. Commissioner, supra at 493.

The above factors serve only as aids in evaluating whether a taxpayer's transfers of funds to a closely held corporation should be considered loans or capital investments.  Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). No single factor is controlling.  Moreover, because of the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not relevant to each case.  Dixie Dairies v. Commissioner, supra at 493.  Our analysis of the factors is set forth below.

I.  Applying the Factors

    A.  Names Given To the Documents

The issuance of a stock certificate indicates a capital contribution; the issuance of a note is indicative of bona fide debt.  Montclair, Inc. v. Commissioner, 318 F.2d 38 (5th Cir.

1963), affg. T.C. Memo. 1962-10. Transfers of funds to a closely held corporation by its sole shareholder are however, subject to heightened scrutiny, and labels attached to these transfers through bookkeeping entries or testimony have limited significance unless the labels are supported by objective evidence. Fin Hay Realty Co. v. United States, supra at 697; Dixie Dairies Corp. v. Commissioner, supra at 495.

Mr. Tedford also indicated what transferred funds were to be included in the claimed loans by writing "loan" on selected checks. In addition, the transfers were listed as loans to shareholders in Border's records and were included as an asset on a personal financial statement for petitioner and Mr. Tedford.

To the limited extent that this factor indicates bona fide debt, this factor favors petitioner's position. We, however, find other factors overriding.

B. Presence or Absence of Fixed Maturity Date

"The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of the same on the other hand would indicate that repayment was in some way tied to the fortunes of the business, indicative of an equity advance." Estate of Mixon v. United States, 464 F.2d 394, 404 (5th Cir. 1972); see also Am. Offshore, Inc. v. Commissioner, supra at 602.

In the instant case, whether or not petitioner and Mr. Tedford would be repaid was contingent upon the success of Border's business. Other than the due date on the "Post-it" note attached to the U.S. Life letter, no fixed maturity date existed. There was no fixed repayment schedule, nor did petitioner show there was any deadline for repayment of balances Border owed.

This factor favors respondent's position.

C. Source of Payments

If it is impossible to estimate when a monetary transfer will be repaid because repayment is contingent upon future profits, a capital investment is indicated. Affiliated Research, Inc. v. United States, 351 F.2d 646, 648 (1965). In addition, when a debtor's repayment is contingent upon earnings the lender acts "'as a classic capital investor hoping to make a profit, not as a creditor expecting to be repaid regardless of the company's success or failure.'" Calumet Indus., Inc. v. Commissioner, supra at 287-288 (quoting In re Larson, 862 F.2d 112, 117 (7th Cir. 1988)).

Despite knowing that Border was struggling financially and that it did not currently have sufficient cashflow to repay them, petitioner and Mr. Tedford chose to transfer funds to Border. Border never made any payments to petitioner and Mr. Tedford, nor did petitioner and Mr. Tedford know whether Border ever would be able to repay them. Although Mr. Tedford executed demand notes

and had the transfers recorded in Border's books, it is clear that petitioner and Mr. Tedford would not have demanded payment if it would have imperiled the financial condition of Border; therefore, repayment was dependent upon the fortunes of Border's business and was indicative of a capital investment.

This factor favors respondent's position.

D.  The Right To Enforce Repayment

An essential element in determining whether a taxpayer intended to enforce repayment of the advance is whether a good-faith intent on the part of the recipient of the funds to make repayment and good-faith intent on the part of the taxpayer to enforce repayment exists.  See Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970).  We must also consider whether, under the facts and circumstances of this case, there was a reasonable expectation of repayment in light of the economic realities of the situation.  See Provost v. Commissioner, T.C. Memo. 2000-177.

We are not convinced petitioner and Mr. Tedford had good-faith intentions of enforcing repayment.  The testimony clearly indicated that petitioner and Mr. Tedford understood Border's financial situation and did not intend to require repayment of the transfers unless and until Border made a profit.  In addition, petitioner and Mr. Tedford's continued lending of additional funds refutes the existence of a valid debtor-creditor relationship between Border, and Mr. Tedford and petitioner with

regard to the funds transferred to Border. See <u>Dunnegan v. Commissioner</u>, T.C. Memo. 2002-119.

Petitioner and Mr. Tedford never demanded nor did they ever receive repayment of the funds or interest thereupon that they transferred to Border. By contrast, Border made principal and interest payments to SunWest, an outside creditor.

This factor favors the respondent's position.

E. <u>Increase in Management Participation</u>

If an individual makes a monetary transfer to a corporation and as a result receives an increased right to participate in the management of the corporation, such participation tends to demonstrate that the advance was not a bona fide debt but rather a capital investment. <u>Am. Offshore, Inc. v. Commissioner</u>, 97 T.C. at 603.

Neither petitioner, nor Mr. Tedford received an increased role in Border's management by virtue of the monetary transfers. Any participation in Border's management by petitioner would have been because of her position as vice president or Mr. Tedford's complete control of the corporation. Therefore, this factor favors petitioner's position.

F. <u>Status Equal or Inferior To Other Creditors</u>

Whether a monetary transfer is subordinated to an outside creditor bears on whether a taxpayer was acting as a creditor or an investor. <u>Estate of Mixon v. United States</u>, <u>supra</u> at 401. In

addition, "Failure to demand timely repayment effectively subordinates the intercompany debt to the rights of other creditors who receive payment in the interim." Am. Offshore, Inc. v. Commissioner, supra at 603 (citing Inductotherm Indus. Inc. v. Commissioner, T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985)).

Petitioner and Mr. Tedford obtained no security interest in Border's assets, whereas SunWest demanded such security. Border paid all of its other creditors while never making any payments of principal or interest to petitioner and Mr. Tedford. When Border ceased operation the proceeds from its liquidation auction went first to paying off the loan it had with SunWest; none of the proceeds were used to repay petitioner.

This factor favors respondent's position.

G. Intent of the Parties

"[T]he inquiry of a court in resolving the debt-equity issue is primarily directed at ascertaining the intent of the parties". A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970) (citing Taft v. Commissioner, 314 F.2d 620 (9th Cir. 1963), affg. in part and revg. in part on another ground T.C. Memo. 1961-230).

Mr. Tedford had invested great amounts of time, work, and money into making Border successful. Border was Mr. Tedford's livelihood, and he wanted to keep Border running. Petitioner and

Mr. Tedford knew the extent of Border's financial problems and knew that transferring funds to Border was risky. Knowing all this, petitioner and Mr. Tedford still chose to make the transfers. Although the transfers were treated as debt in Border's records, on the basis of the other factors, we do not believe petitioner and Mr. Tedford intended, or could have reasonably intended, the transfers to be bona fide debt.

This factor favors respondent's position.

H. "Thin" or Adequate Capitalization

A monetary transfer to a corporation appears to be a capital contribution if the corporation is thinly capitalized. Am. Offshore, Inc. v. Commissioner, supra at 604.

At trial Mr. Edge testified as to valuation of Border's assets. Mr. Edge is not a certified appraiser, nor was he designated as an expert witness on construction equipment or auctions; therefore, we disregard his testimony as to the valuation of Border's assets.

There is evidence in the record from which an inference can be drawn that Border's capitalization was inadequate, such as petitioner and Mr. Tedford's continuous transfers of cash and Border's inability to get loans from outside creditors. Therefore, this factor favors respondent's position.

I.  The Identity of Interest Between Creditor and
    Shareholder

This factor generally compares the equity ownership of
stockholders with their position as creditors in order to
determine whether there is an identity of interest between the
two positions.  See Am. Offshore, Inc. v. Commissioner, supra at
604-605.

Mr. Tedford was the sole shareholder of Border; therefore,
this factor does not exist in this case.  Consequently, we do not
rely upon or apply this factor in making our analysis.

J.  Source of Interest Payments

This factor is essentially the same as the third factor, the
source of the payments.  Hardman v. United States, 827 F.2d 1409,
1414 (9th Cir. 1987).  It focuses, however, on how the parties
treated interest.  As we have stated, "a true lender is concerned
with interest."  Estate of Mixon v. United States, supra at 409.
When shareholders transfer sums to a corporation and do not
insist that the corporation make interest payments, it indicates
that the shareholders expect to be paid out of future earnings or
through the increased market value of their equity interest.
Am. Offshore, Inc. v. Commissioner, 97 T.C. at 605 (citing Curry
v. United States, 396 F.2d 630, 634 (5th Cir. 1968)).

Border did not, and probably financially could not, make any
interest payments to petitioner and Mr. Tedford during 1994 or

1995. Nor is there evidence that petitioner and Mr. Tedford ever demanded payment of interest.

This factor favors respondent's position.

### K. Ability of Border To Obtain Loans from Outside Lending Institutes

"[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms." Segel v. Commissioner, 89 T.C. 816, 828 (1987) (citing Scriptomatic Inc. v. United States, 555 F.2d 364, 367 (3d Cir. 1977)); see also Calumet Indus., Inc. v. Commissioner, 95 T.C. at 287.

Although, "the mere fact that a loan could not be obtained from an unrelated source does not preclude the existence of a bona fide loan," Jack Daniel Distillery v. United States, 180 Ct. Cl. 308, 332, 379 F.2d 569, 584 (1967), evidence that Border was unable to obtain loans from outside lenders is an indication that petitioner and Mr. Tedford's transfers were capital investments. Petitioner and Mr. Tedford's financial support of Border through the monetary transfers had no security or fixed payment terms and was far more speculative than any transfers an outside party would presumably make. See Fin Hay Realty Co. v. United States, 398 F.2d at 697; Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 497 (1980).

This factor favors respondent's position.

L.  Use of the Funds by the Corporation

Generally, the fact that an advance is used to satisfy the daily operating needs of a corporation indicates a bona fide indebtedness, whereas a monetary transfer resembles equity if it is used to acquire capital assets.  Estate of Mixon v. United States, 464 F.2d at 410.

Mr. Tedford and petitioner made the transfers to keep Border from defaulting on its bank loans and other obligations, to pay Border's operating expenses, and to allow Border to buy supplies and equipment.  As the transferred funds were used both to satisfy the daily operating needs of Border and to acquire capital assets, we conclude this factor is neutral.  Consequently, we do not rely upon or apply this factor in making our analysis.

M.  Failure To Repay on the Due Date

In the instant case there were no fixed dates of repayment.  Petitioner and Mr. Tedford never demanded repayment, nor did Border ever make any attempt to repay them.

This factor favors respondent's position.

II.  Conclusion

Upon consideration of the above factors, we hold that the monetary transfers to Border from Mr. Tedford and petitioner did not constitute bona fide loans, and, therefore, the transfers

should be treated as capital contributions.  Petitioner may not take a deduction for bad debt under section 166.

In reaching our holding herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.