T.C. Memo. 2018-18

UNITED STATES TAX COURT

MICHAEL J. BURKE AND JANE S. BURKE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15683-14.                    Filed February 21, 2018.

<u>Stephen Lee Christian</u>, <u>Joseph E. Mudd</u>, and <u>Gregory Michael Beck</u>, for

petitioners.

<u>Jenny R. Casey</u>, <u>Hans Famularo</u>, and <u>Miles D. Friedman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Michael Burke dove into a business venture with a

friend, and continued to advance it funds even as it started to sink.  When it failed,

[*2] he tried to deduct the money he'd lost. The Commissioner thinks Burke is trying to disguise an equity investment as a debt and disallowed the loss.

FINDINGS OF FACT

Burke is currently a retiree, but before that he enjoyed a long and lucrative career as an urban planner at a firm called RBF Consulting. But this case began when he met an old friend from Santa Ana College, Hugh Parkey. Burke and Parkey had taken a scuba-diving instructor-training program there together, and for a short while they worked together as instructors. Parkey then moved to Belize, and for a long time these old friends lost touch.

Then, many years later, Parkey let Burke know that he was getting married, and the old friends reconnected. Burke learned that scuba diving had become Parkey's vocation--a vocation that had led Parkey to become a scuba-diving instructor and the manager of a diving and fishing resort in Belize. Burke himself had left scuba diving behind in favor of urban planning. But Belize is a popular vacation spot, and Burke and his wife found several occasions to visit Parkey over the years.

The Parkeys eventually opened a restaurant and guesthouse in Belize City, but Parkey missed the scuba-diving business and came to Burke for money to start his own. Burke credibly testified that he and Parkey discussed his business plans

[*3] in great detail.  Burke decided that he'd "loan" money to Parkey, but only if Parkey gave him an "interest" in the business.  So sometime in 1995 Burke sent $30,000 to Parkey and together they formed Hugh Parkey's Belize Dive Connection (Belize Dive) as a Belizean corporation.  Burke never prepared formal loan documents for the payment, but instead recorded it in his personal books and gave a copy of that record to Parkey.  The two of them owned Belize Dive together as 50-50 shareholders until 2002, when Parkey passed away.

After his friend's death, Burke tried to sell the business to a local resort.  But just as Burke was about to accept the resort's offer, Mrs. Parkey asked him to stop the sale.  She didn't like the resort's manager, and thought it would be a slight to her husband's reputation to sell the business to him.  Burke was happy to oblige, and he let Mrs. Parkey assume her husband's 50% interest.  Mrs. Parkey had her own vision for Belize Dive; she was interested in pursuing cruise-line companies for business.

She thought it was a great opportunity.

She was wrong.

Belize Dive did grow after it started to fish for business with the cruise lines, but it started to need more capital for boats and diving equipment.  It also needed more staff.  Burke continued to send money--money he says he was meant

**[*4]** to get back--toward the company, but the business never quite ran at a profit. Burke did keep a personal record of the advances he sent to Belize Dive, and at the end of each year he turned it over to Belize Dive for inclusion in the corporate records. He never saw these records, though.

Belize Dive's need for capital continued to grow. It at first provided only scuba-diving services to the cruise lines, but thought it would make sense to offer snorkeling too. To do that, it needed yet more boats and yet more equipment--masks, fins, and life preservers. Cruise lines keep their passengers on a tight schedule, which gave Belize Dive only a short time to get its customers from the ship, get them to a place to snorkel, and then return them. To make *that* work, Belize Dive leased a 186-acre island between the cruise-ship dock in Belize City and the snorkeling reefs. After a short time, Belize Dive bought the island. This cost yet more money, and Burke testified that he "loaned" the money to Belize Dive to buy the island but admitted that he did not get a promissory note in exchange.

Burke continued to send money to Belize Dive to make improvements after the purchase of the island, but he was reaching his limit and found it necessary to seek outside financing. In came a third partner--a man named Wayne McNab--to help bear the burden. In 2005 McNab became a 10% shareholder through dilution

[*5] of Mrs. Parkey's stake when he kicked in $250,000. Burke himself continued to advance funds, though, and with growing worry about Belize Dive's future, he asked for and received an additional 10% share in the company for himself. Mrs. Parkey, however, continued to have new ideas, and her ideas continued to be expensive. In 2009 Belize Dive built a man-made lagoon on its island where customers could swim with four dolphins. Revenues were less than expected.

That was enough. After one last multimillion-dollar spasm of money transfers, Burke finally gave up. The numbers are a bit cloudy, but we find it more likely than not from our review of the evidence that this table accurately summarizes Burke's advances to the corporation.

| Year | Amount |
|------|--------|
| 1995 | $30,015.00 |
| 1996 | 10,697.81 |
| 1997 | 102,339.25 |
| 1998 | 115,628.09 |
| 1999 | 223,672.45 |
| 2000 | 116,228.82 |
| 2001 | 106,256.95 |
| 2002 | 130,558.33 |
| 2003 | 560,407.37 |

| [*6] | 2004 | 818,890.55 |
|------|------|------------|
| | 2005 | 1,157,420.80 |
| | 2006 | 1,340,559.59 |
| | 2007 | 1,396,957.47 |
| | 2008 | 880,050.26 |
| | 2009 | 1,245,901.40 |
| | 2010 | 811,869.10 |
| | 2011 | 2,004,126.05 |
| | Total | 11,051,579.29 |

Burke now claims that each advance to Belize Dive was a loan. Other than the summary above, which he claims is the result of contemporaneous recordkeeping, Burke did not obtain formal loan documents for any of these payments before 2010. Each time Burke advanced money, he did so without setting a time for repayment, and at the time of trial he had not received a single repayment of any advance or even of interest.[1] He didn't expect to receive payment until the business was profitable and he'd "be paid [his] share of the profits." In contrast, when Belize Dive obtained loans from other lenders over the years, it signed formal written documents and paid the lenders back.

---

[1] Burke said during trial that Belize Dive owed him interest on the loans, but he was unable to point to any proof of that.

[*7] Burke started to work with tax attorneys in Laguna Hills, California to file his returns when he disposed of an unrelated investment on which he had made a substantial capital gain. Burke and his attorneys were focused on tax planning, and more specifically, "review[ing] alternatives for creating capital loss to offset capital gain." It was out of this tax-planning process that three promissory notes from Belize Dive surfaced. Each note was created on January 1, 2010. Burke claims that he had them drawn up under his attorneys' suggestion to "give" or "pass" some of his "debt" to Mrs. Parkey to encourage her not to leave Belize Dive. The first note was a junior promissory note for $3,000,000; the second was a junior promissory note for $2,171,000; and the third was a senior promissory note for $6,000,000.[2] We find that Mrs. Parkey did sign each note on behalf of Belize Dive, though neither she (nor anyone else from the company) testified. Burke claims that after they signed the note for $3,000,000 they discovered an error, and drew up the second note for $2,171,000. So the second note was meant

---

[2] Burke claims that the third note for $6,000,000 is senior to the others because he believed he'd be able to recoup only $6,000,000 from Belize Dive's sale.

**[*8]** to replace the first note, but Burke offered no explanation as to why they were signed on the same day or cover different periods.[3]

In November 2010 Burke sold his $2,171,000 junior promissory note to Mrs. Parkey for $1. Burke claims that he wanted to give Mrs. Parkey the debt for free but that his attorneys told him there was a tax advantage to selling it to her instead. Then in December 2010 Belize Dive retired both Mrs. Parkey's and Burke's "debt". Burke received in exchange an additional 12.5% interest in Belize Dive (bringing his total to 82.5%), and Mrs. Parkey's interest sank from 30% to 15%.[4] Burke then signed a deferred compensation agreement with the company to create a book reserve for $354,230 for Mrs. Parkey. We specifically find that the promissory notes, the sale of the note to Mrs. Parkey, and the deferred compensation agreement were more likely than not orchestrated by Burke and his attorneys to offset the large capital gains Burke had from unrelated interests in his 2010 and 2011 tax years. They are not proof of what they purport to show happened before they were all executed.

---

[3] The third note also bobbed up only at trial. At the audit Burke provided only the notes for $3,000,000 and $6,000,000.

[4] McNab's interest in Belize Dive shriveled from 10% to 2.5%.

**[\*9]** With all this paper in place, Burke's attorneys "review[ed] the tax consequences of Debt Sale or compromise with related party entity" in August 2010, and they advised Burke that he was entitled to claim some losses. Burke claimed a short-term capital loss of nearly $800,000 and a long-term capital loss of more than $2 million on his 2010 tax return. He then claimed short-term and long-term capital losses on his 2011 tax return.

The Commissioner audited these returns and determined that Burke had deficiencies for the 2010 and 2011 tax years and owed accuracy-related penalties besides:

| Tax year | Tax | Sec. 6662(a) Penalty |
| --- | --- | --- |
| 2010 | $179,136 | $70,928.20 |
| 2011 | 264,470 | 105,788.00 |

The only issues are whether Burke's advances to Belize Dive were loans or capital contributions and whether he is also liable for accuracy-related penalties under section 6662(a).[5] The parties did not stipulate, and the Commissioner has not

---

[5] Unless stated otherwise, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*10]** moved to introduce, any evidence that a supervisor had approved in writing the initial determination to include these penalties in the notice of deficiency.

OPINION

I.     Debt or Equity

The parties' arguments here are simple:  Burke argues that his advances to Belize Dive were *bona fide* debts, and the Commissioner argues that the advances look more like equity.  A *bona fide* debt is one that "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."  Sec. 1.166-1(c), Income Tax Regs.; see also Kean v. Commissioner, 91 T.C. 575, 594 (1988).  Whether a purported loan is a *bona fide* debt is determined by the facts and circumstances of each case.  See, e.g., A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).  The Ninth Circuit[6] has identified eleven factors to consider in a debt-equity analysis, but strongly cautions us not to overemphasize any one of them.  A.R. Lantz Co., 424 F.2d at 1333.  The factors are:

- the names given to the certificates evidencing the indebtedness;

---

[6] Burke was a California resident when he filed his petition, which makes the case appealable to the Ninth Circuit under section 7482(b)(1)(A).

[*11] ● the presence or absence of a maturity date;

● the source of the payments;

● the right to enforce the payment of principal and interest;

● participation in management;

● a status equal to or inferior to that of regular corporate creditors;

● the intent of the parties;

● "thin" or adequate capitalization;

● identity of interest between creditor and stockholder;

● payment of interest only out of "dividend" money; and

● the ability of the corporation to obtain loans from outside lending institutions.

Id. (quoting O. H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 125-26 (9th Cir. 1960), aff'g T.C. Memo. 1959-110).  We of course follow this caselaw, and discuss each of these factors, but will not let ourselves be poked by any of these prongs away from our goal of discerning the parties' intent at the time of the advances.  Bauer v. Commissioner, 748 F.2d 1365, 1367-68 (9th Cir. 1984), rev'g T.C. Memo. 1983-120.

**[*12]** A.     Names

Formal loan documentation, such as a bond, a debenture, or a note, tends to show that an advance is a *bona fide* debt.  See Hardman v. United States, 827 F.2d 1409, 1412 (9th Cir. 1987); PepsiCo Puerto Rico, Inc. v. Commissioner, T.C. Memo. 2012-269, at *57.  It is undisputed here that Burke did not get formal loan documentation when he made each advance.  Instead, his first advance got him a 50% interest in Belize Dive, and his later advances got him a 10% increase in his ownership share.  Burke points to the January 2010 promissory notes as evidence of *bona fide* indebtedness, but we've already found those promissory notes were parts of some *post hoc* tax planning, so they are of little help in determining Burke's intent when he made the advances.  *Post hoc* papering inconsistent with how Belize Dive treated unrelated lenders in fact more strongly reinforces a finding that this factor supports characterization of the advances as equity.

B.     Maturity Date

"The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation."  Estate of Mixon v. United States, 464 F.2d 394, 404 (5th Cir. 1972); see also PepsiCo Puerto Rico, Inc., at *57.  Burke's alleged loans to Belize Dive had no fixed maturity date, and Burke credibly

[*13] explained that he expected to be paid only when Belize Dive was sold or profitable. This too weighs in favor of finding the advances to be equity.

###### C. Source of the Payments

If the source of repayments depends on earnings, an advance is more likely to be equity. Estate of Mixon, 464 F.2d at 405; Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 602-03 (1991); Provost v. Commissioner, T.C. Memo. 2000-177, 2000 WL 687889, at *5. That's exactly what we had here: Burke admitted that he didn't expect to receive payment until the business was profitable and he'd "be paid [his] share of the profits."

###### D. Right To Enforce

An enforceable and definite obligation to repay an advance indicates the existence of a *bona fide* debt. See Hardman, 827 F.2d at 1413; Estate of Mixon, 464 F.2d at 405. Burke argues that Belize Dive had an enforceable and definite obligation to repay his advances both after *and* before the execution of the 2010 promissory notes. He argues that before the notes, Belize Dive's financial statements recorded his advances as loans, but points to no authority that this would give him a right to enforce their repayment. And even if we view the 2010 promissory notes as having created an enforceable right to repayment, failure to take customary steps to ensure repayment is an indication of equity. Shedd v.

**[*14]** <u>Commissioner</u>, T.C. Memo. 2000-292, 2000 WL 1337177, at *4. Burke stumbles on these steps here--he never asked for repayment, and we find that he never intended to enforce the notes: As part of his tax planning, he sold one and relied on the possible sale of Belize Dive to pay the other. This factor weighs in favor of finding the advances to be equity.

E. <u>Participation in Management</u>

When a taxpayer receives a right to participate in management or an increase in his ownership stake in exchange for an advance, it suggests that the advance was an equity investment and not a *bona fide* debt. <u>Hardman</u>, 827 F.2d at 1413; <u>Am. Offshore, Inc.</u>, 97 T.C. at 603; <u>Provost</u>, 2000 WL 687889, at *6. Because Burke's initial transfer to Belize Dive in 1995 came with a 50% share in the company, that advance definitely indicates an equity investment. After that, however, Burke's participation in management at Belize Dive is unclear. He testified that his only role was to lend money, but later said that he reviewed tax documents and cashflow statements. It does not, however, seem he was involved in the day-to-day operations of Belize Dive, and any involvement he did have was minimal.

Burke didn't receive additional stock for later contributions until after he'd already advanced millions of dollars to Belize Dive, and this was only a 10%

[*15] increase in a flailing company. He credibly testified that he wanted the additional 10% so that he'd have more control over Belize Dive's direction given its unstable business and the substantial funds he'd already advanced; and he emphasized that he needed it if he was going to give Belize Dive any more money. An increased interest or participation needed to prevent a company's collapse does not by itself mean an advance is an equity investment. Owens v. Commissioner, T.C. Memo. 2017-157, at *33; Flint Indus., Inc. v. Commissioner, T.C. Memo. 2001-276, 2001 WL 1195725, at *13. But Burke received an extra 12.5% interest in Belize Dive in 2010 when it retired his debt. With elements cutting both ways, we find this factor to be neutral.

F.      Status Equal or Inferior to Other Creditors

Taking a subordinate position to other creditors indicates an equity investment. See PepsiCo Puerto Rico, Inc., at *84; CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16, 2005 WL 209951, at *39. Burke readily admitted during trial that his purported loans were subordinate to those of Belize Dive's secured creditors. He argues on brief, however, that they were *not* subordinate to those of Belize Dive's unsecured creditors, but there is nothing in the record to support this position. And Burke in fact testified during trial that his

**[*16]** "debt" was subordinate to several other of Belize Dive's financial arrangements.  Thus, this factor supports a finding of equity.

G.     The Parties' Intent

"[T]he inquiry of a court in resolving the debt-equity issue is primarily directed at ascertaining the intent of the parties." A.R. Lantz Co., 424 F.2d at 1333.  But the Ninth Circuit includes intent itself as a factor in this multifactor analysis. Id.  This might otherwise be confusing, but caselaw seems to treat this factor as the place to look for contemporaneous evidence of subjective intent. Id. at 1333-34.  That evidence shows that Burke never received or demanded payments of either interest or principal from Belize Dive, and he expected to be paid back only out of profits.  That evidence also shows no contemporaneous documentation from Belize Dive that stated the advances were loans--a lack which is particularly telling because Belize Dive *did* borrow money from more conventional lenders and *did* paper those transactions as conventional loans.  Burke admits that during the time he was making advances to Belize Dive he didn't even know for sure that they were being recorded as loans in its books.  While Belize Dive's financial statements do show that they included Burke's advances in their total debt, we give this little weight:  No one from Belize Dive,

**[*17]** other than Burke, testified on his behalf. This factor also favors a finding of equity.

### H. "Thin" or Adequate Capitalization

Thin or inadequate capitalization is strong evidence of a capital contribution where: "(1) The debt to equity ratio was initially high, (2) the parties realized that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations." Am. Offshore, Inc., 97 T.C. at 604. Because neither party argued on brief that evidence in the record directly supports or negates this factor, we treat it as neutral. See, e.g., Provost, 2000 WL 687889, at *8.

### I. Identity of Interest

Advances in proportion to the stockholder's capital interest indicate a finding that the advance was an equity investment. Hardman, 827 F.2d at 1414; Am. Offshore, Inc., 97 T.C. at 604. What financial records we have for Belize Dive in the record indicate that from 1995 through 2011 (with the exception of 2010) Belize Dive's liabilities exceeded its assets. And when Belize Dive lacked money to cover its operating expenses, Burke just handed over the funds. We've found before that these circumstances create an identity of interest between the purported creditor and the controlling shareholder. CMA Consol., Inc., 2005 WL

**[*18]** 209951, at *41. This factor weighs in favor of finding that the advances were equity.

J.      Payment of Interest Out of "Dividend" Money

The presence of a fixed rate of interest, and the actual payment of interest, indicate a *bona fide* debt. See Am. Offshore, Inc., 97 T.C. at 605. There is no evidence here--aside from Burke's own testimony--that his advances were even supposed to accrue interest. It is also undisputed that Belize Dive never paid any interest even if it was required, and that Burke didn't ask for it, or intend to. "The failure to insist on interest payments indicates that the payors are not expecting substantial interest income, but are more interested in the future earnings of the corporation or the increased market value of their interest." Id. This weighs in favor of a finding that the advances were equity.

K.      The Ability of the Corporation To Obtain Loans From Outside
        Lending Institutions

If a corporation is able to borrow funds from an outside source at the time of the advance, the transaction looks more like a *bona fide* debt. Hardman, 827 F.2d. at 1414; Am. Offshore, Inc., 97 T.C. at 605. The Commissioner mistakenly distorts this factor to say that although Belize Dive was able to obtain financing from other lenders, those transactions were at arm's length and Burke's were not,

**[\*19]** and so should count against him. While Belize Dive's treatment of third-party lenders is important, we've already dealt with it. This one factor does favor a finding that Burke's advances to Belize Dive were *bona fide* debts.

Having swum through each of these prongs, we have to make a finding about the parties' intent at the times Burke advanced funds to Belize Dive. We conclude that the absence of the normal incidents of a loan--especially a maturity date and a stated interest rate--are most telling here. Without those aspects of a loan the advances look much more like capital contributions--and the peculiar advantage to Burke of generating a capital loss in 2010 to offset a large capital gain means that the papering his tax advisers did that year to make the advances look more like loans just makes it more likely than not that, at the time he made them, Burke and the Parkeys intended those advances to be capital contributions. Our conclusion is only reinforced by the strong evidence of the old friendship of Burke and Parkey and Burke's desire to help his old friend turn their old hobby into a new business--a practical partnership where Burke contributed money and Parkey contributed his labor and expertise and both hoped to share in the profits.

Burke also tries to salvage some loss out of this situation and insists that the transfer of the note to Mrs. Parkey in 2010 was at the least the disposition of a capital asset of some sort. We disagree--the deal was made to seem as if it were

[*20] the sale of a portion of the debt owed by Belize Diving to Burke. But we have found that there was no debt to sell, and insufficient evidence that there was a sale at all. We suspect (though we don't actually have to find anything because no party raised it) that Burke and Mrs. Parkey's agreement that led to Burke's owning 82.5% of the stock in Belize Dive was a simple tax-free recapitalization under section 368(a)(1)(E)--a "reshuffling of a capital structure within the framework of an existing corporation." See Helvering v. Southwest Consol. Corp., 315 U.S. 194, 202 (1942). Burke may well be entitled to a capital loss when he disposes of that stock, but not until then and not for the years at issue here.

## II.    Penalties

The Commissioner also asserts that Burke is liable for accuracy-related penalties under section 6662(a) for his 2010 and 2011 tax years. Section 6662(a) imposes a 20% penalty when there is an underpayment attributable to "[a]ny substantial understatement of income tax." Sec. 6662(b)(2). Part of whether the Commissioner met his initial burden of production is a simple math problem: An understatement of tax is "substantial" if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." Secs. 6662(d)(1)(A),

[*21] 7491(c). Burke's understatements for the 2011 and 2012 tax years surpass both $5,000 and 10% of the tax required.

Burke asserts, however, that he had reasonable cause and acted in good faith. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs. He specifically argues that he is not liable for the penalties because he relied on the advice of a tax adviser. Reliance on an adviser can excuse a taxpayer from an accuracy-related penalty but only if his reliance was reasonable. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Reliance is reasonable if:

- the adviser was a competent professional with sufficient expertise to justify reliance;

- the taxpayer provided necessary and accurate information to the adviser; and

- the taxpayer actually relied on the adviser's judgment in good faith.

Id. at 99. The Commissioner does not dispute that Burke's attorneys were competent professionals. And Burke credibly testified that he gave his attorneys the records he kept that detailed his advances to Belize Dive. We find this sufficient proof of the first two requirements for reasonable reliance.

**[\*22]** What troubles us is the tax-planning strategy those lawyers came up with when they got this information. They recharacterized Burke's advances to Belize Dive as loans and did some last-minute papering to make it seem as if they were. After listening to Burke, we don't find that he could have reasonably relied on their advice that this would work--there were just too many red flags that a sophisticated businessman should have noticed. First, he went along with their plan even though he himself had never treated his advances to Belize Dive as if they were loans. He couldn't fully explain why he was selling debt to Mrs. Parkey or how that would give her an incentive to stay with Belize Dive. And it seems just way too convenient to draft promissory notes for advances already made just as he'd given up on the company.

We do not, however, sustain the section 6662(a) accuracy-related penalties for the years at issue. The Commissioner failed to present any evidence that the penalties were "personally approved (in writing) by the immediate supervisor of the individual making such determination." See sec. 6751(b)(1); Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; Graev v. Commissioner, 149 T.C. ___, ___ (slip op. at 14) (Dec. 20, 2017), supplementing 147 T.C. ___ (Nov. 30, 2016). Accordingly, he did not

[*23] meet his burden of production, and Burke is not liable for the determined

penalties.  See sec. 7491(c); Graev, 149 T.C. at ___ (slip op. at 14-15).

There were settlements and concessions on other issues, so

Decision will be entered under

Rule 155.