# United States Tax Court

T.C. Memo. 2024-106

MOHAMAD NASSER ABOUI AND MAHYAR MIZANI,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 12804-20.                          Filed December 9, 2024.

————

*Stephan M. Brown*, *Daniel J. Griffin*, and Corey A. Hall (specially recognized), for petitioners.

*Harrison M. Marks*, *Daniel J. Kleid*, *Julie Vandersluis Skeen*, and *Sharyn M. Ortega*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*: Respondent issued a notice of deficiency to petitioners determining deficiencies of $805,149, $1,145,104, $1,161,864, and $831,771 and section 6662(a)[1] accuracy-related penalties of $161,030, $229,021, $232,373, and $166,354 for 2013, 2014, 2015, and 2016 (years at issue), respectively. In his Answer, respondent asserted increased deficiencies of $970,872, $1,374,515, and $1,181,074 and increased penalties of $194,174, $274,903, and $237,015 for 2013, 2014, and 2015, respectively. He has conceded part of the deficiency for 2016, reducing it to $756,519 and the penalty to $151,304.

—————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded.

[*2]   The issues for consideration are whether

1. HPPO Corp. Autoville Motors (HPPO) had unreported gross income for 2016. We hold it did not;

2. HPPO may deduct cost of goods sold (COGS), business expenses, and bad debts for each year at issue. We hold it may to the extent stated herein;

3. petitioners may deduct a net operating loss (NOL) for each year at issue. We hold they may not;

4. petitioners may deduct real estate losses for each year at issue. We hold they may to the extent stated herein;

5. petitioners received taxable distributions from HPPO during each year at issue. We hold they received some taxable distributions in 2015 and 2016; and

6. petitioners are liable for a section 6662(a) penalty for each year at issue. We hold they are not liable.

FINDINGS OF FACT

When petitioners timely filed the Petition, they resided in California.

I.   *HPPO's Business*

During the years at issue Mohamad Nasser Aboui was the sole shareholder of HPPO, an S corporation for federal tax purposes. HPPO owned several used car dealerships. Mr. Aboui formed HPPO in 2009 by consolidating multiple used car lots that he owned. He contributed $5,167,089 of used cars to HPPO for its starting inventory.

Most of HPPO's customers had poor credit. Many did not have checking accounts and paid HPPO in cash. Often HPPO used the cash to pay its employees and other expenses and did not deposit it into HPPO's bank accounts. HPPO offered in-house financing to its customers. It financed approximately 90% to 95% of its sales and retained security interests in the cars. When HPPO financed a car purchase, it reported the sale price as income in the year of sale.

Customers repaid the loans in less than 10% of HPPO's sales. HPPO repossessed approximately 25% of the cars within three to four

[*3] months of purchase and approximately 50% within one year. During the years at issue HPPO was unable to repossess over 250 cars after the buyers stopped making payments. When HPPO repossessed a car, it typically was in worse condition than when HPPO had sold it, sometimes with serious mechanical issues from the buyer's failure to service the car.

HPPO bartered with mechanics for repair services in exchange for rental of HPPO's garage space or as payment for the purchase of a used car. Mr. Aboui started using the barter system to recoup equipment and other costs that he incurred to set up HPPO's repair services. Typically, the cars that HPPO sold to the mechanics were older and required too many repairs for HPPO to fix for resale. The mechanics submitted invoices for their services. HPPO reported the invoiced amounts as expenses and also reported the related income.

HPPO used specialized accounting software designed for car dealerships. It also maintained dealer jackets, a special filing system for car dealerships to maintain all paperwork relating to their sales. It reported sales to the California Department of Motor Vehicles (DMV sales report) and filed California sales tax returns. Petitioners provided HPPO's records to their accountant monthly. During the years at issue HPPO had two bank accounts over which both petitioners had signature authority, and petitioners had three personal accounts.

Around 2014 Mr. Aboui decided to close HPPO because his family was experiencing serious health issues and because HPPO was unprofitable. He began to wind down the business. He reduced HPPO's staff by half and purchased less inventory than in prior years. He began to withdraw money from HPPO's bank accounts for his personal use and used HPPO's bank accounts to pay expenses unrelated to HPPO, including expenses relating to his real estate activities, discussed below. The withdrawals and payments totaled approximately $7.5 million during the years at issue. Neither HPPO nor petitioners reported shareholder distributions for the years at issue. In June 2017 the California Department of Consumer Affairs revoked HPPO's car repair dealer registration, and HPPO ceased business by 2018.

II.     *Other Income and Return Reporting*

During the years at issue petitioners engaged in rental real estate activities and acquired additional rental properties. At yearend 2013

[*4] they owned 22 rental properties, and at yearend 2016 they owned 55. They had an additional bank account for their rental activities.

On its return for each year at issue, HPPO reported COGS and claimed business expense deductions as set forth in the table below. It also reported that it used the accrual method of accounting and reported beginning and ending inventory. It reported ordinary business income or loss of −$64,051, −$67,583, −$4,254, and $16,030 for 2013, 2014, 2015, and 2016, respectively. Petitioners reported HPPO's loss on their 2013 return and attached Schedule E, Supplemental Income and Loss. However, they did not report HPPO's passthrough income or losses for 2014–16 on Schedule E, and it is unclear to the Court how or whether petitioners accounted for HPPO's income or losses on their personal returns for those years. Nor does the Notice of Deficiency indicate the amount of passthrough income or loss that petitioners received from HPPO for 2014–16, if any. Petitioners hired the same return preparer for HPPO's and their personal returns.

Petitioners reported significant losses from most rental properties on Schedules E of their returns and deducted $25,000 in passive real estate losses for 2013, 2015, and 2016. They deducted $43,629 in passive real estate losses for 2014. In the Notice of Deficiency respondent disallowed a $25,000 deduction for each year. In his Answer he asserted an increased disallowance of the entire $43,629 deduction for 2014.

Petitioners also deducted NOLs of $287,883, $225,626, $133,668, and $113,364 for 2013, 2014, 2015, and 2016, respectively. They did not file statements with their returns setting forth a detailed schedule of the computation of the NOL deductions. *See* Treas. Reg. § 1.172-1(c). Respondent disallowed the NOL deductions in their entirety.

III. *Audit of HPPO's and Petitioners' Returns*

Respondent began an audit of petitioners' and HPPO's returns in September 2015. At that time petitioners' accountant was gravely ill, and he later died. His death contributed to a lack of progress on the audit. In October 2018 petitioners gave a power of attorney to a new representative who erroneously told the Internal Revenue Service (IRS) revenue agent (RA) that HPPO was a cash basis taxpayer and that HPPO did not include the total sale prices in gross receipts in the year of sale. Other actions by the new representative further delayed production of HPPO's records. Petitioners later replaced the representative in an attempt to resolve the audit. However, by that time,

**[*5]** after working on the case for nearly five years, the RA decided to close the audit.

During the audit petitioners produced or provided access to the DMV sales reports and dealer jackets as well as other records. These documents contained sufficient information to determine HPPO's gross income but likely not HPPO's deductible expenses. Petitioners delayed providing access to HPPO's accounting software because HPPO did not retain a license for the software after it ceased business. The RA never had access to the software, but petitioners reactivated it before trial.

Partly because of the representative's misstatement, the RA treated HPPO as a cash basis taxpayer. The RA also found HPPO's records incomplete. She reviewed HPPO's dealer jackets only for 2013; they confirmed, with a minimal discrepancy, the gross income that HPPO reported. However, the RA decided not to use the dealer jackets or the DMV sales report because she was unable to obtain records from an independent third party, such as the California Department of Motor Vehicles, to verify their accuracy. She decided to reconstruct HPPO's gross income and determine its deductible business expenses using a bank deposit analysis.

Using the bank deposit analysis the RA determined that HPPO reported nearly $3.25 million more gross income for 2013–15 than petitioners deposited into HPPO's bank accounts during those years. However, she determined that HPPO underreported its gross income for 2016 by $539,209 as follows:

| Year | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|
| Total income per return | $5,275,805 | $6,422,853 | $6,460,327 | $2,636,621 |
| Total income per audit | 5,198,919 | 5,008,432 | 4,702,346 | 3,175,830 |
| Difference | 76,886 | 1,414,421 | 1,757,981 | (539,209) |

The RA's review of the 2013 dealer jackets also confirmed that HPPO reported more gross income than its bank deposits. In the Notice of Deficiency respondent determined that HPPO underreported its 2016 income by $539,209. However, he did not decrease HPPO's gross income for 2013–15.

[*6]    Because the RA concluded that petitioners did not provide sufficient records or access to HPPO's accounting software, she went through the arduous process of reviewing thousands of pages of bank statements and canceled checks to determine whether the debits from HPPO's bank accounts were used to pay expenses related to HPPO's business. On the basis of the RA's analysis, respondent allowed part of the COGS and business expense deductions as shown in the following table. Respondent did not separately state the allowable COGS and business expenses.

| Year | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| COGS per return | $2,492,394 | $3,977,675 | $3,744,910 | $1,062,694 |
| Business expense deductions per return (excluding bad debt) | 1,777,723 | 1,838,874 | 1,816,707 | 1,121,159 |
| Total per return | 4,270,117 | 5,816,549 | 5,561,617 | 2,183,853 |
| Allowed COGS and business expense deductions per audit | 2,949,400 | 3,006,122 | 3,411,007 | 1,251,048 |
| Disallowed per audit (excluding bad debt) | 1,320,717 | 2,810,427 | 2,150,610 | 932,805 |

HPPO also deducted bad debts of $1,069,739, $668,537, $902,967, and $436,738 for 2013, 2014, 2015, and 2016, respectively. Respondent disallowed the bad debt deductions in their entirety.

Using the bank deposit analysis the RA also determined that HPPO distributed funds to Mr. Aboui and paid expenses unrelated to HPPO from HPPO's bank accounts of $2,476,301, $1,704,329, $1,406,893, and $1,934,033 during 2013, 2014, 2015, and 2016, respectively. In the Notice of Deficiency respondent treated the distributions and expense payments as taxable shareholder distributions.

When the parties were preparing for trial, petitioners offered thousands of pages of records to substantiate HPPO's expenses and COGS as well as HPPO's income. Despite encouragement from the Court, respondent did not review the records.

[*7]                                          OPINION

I.       *HPPO's Gross Income*

Taxpayers must maintain and keep accurate records establishing the amount of their gross income. § 6001. When a taxpayer fails to do so, the IRS may reconstruct the taxpayer's income under any method that, in its opinion, clearly reflects income. § 446(b); *Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989). The IRS's income reconstruction must be reasonable in the light of all surrounding facts and circumstances. *Petzoldt*, 92 T.C. at 687. A bank deposit analysis is a permissible method to reconstruct income in the absence of adequate books and records. *See Clayton v. Commissioner*, 102 T.C. 632, 645 (1994); *see also Langille v. Commissioner*, T.C. Memo. 2010-49, *aff'd*, 447 F. App'x 130 (11th Cir. 2011).

Bank deposits are prima facie evidence of income, and the IRS does not need to prove a likely source of income. *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986); *Estate of Mason v. Commissioner*, 64 T.C. 651, 656–57 (1975), *aff'd*, 566 F.2d 2 (6th Cir. 1977). The bank deposits method assumes that all money deposited into a taxpayer's bank account is taxable unless the taxpayer shows that the deposits are nontaxable or that he previously reported them as income. *Clayton*, 102 T.C. at 645–46; *DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992). However, the IRS must take into account any nontaxable sources of income that it has knowledge of. *Price v. United States*, 335 F.2d 671, 677 (5th Cir. 1964); *DiLeo*, 96 T.C. at 868. Once the IRS reconstructs a taxpayer's income, the taxpayer bears the burden of proving that the IRS's implementation of the bank deposits method is unfair or inaccurate. *Clayton*, 102 T.C. at 645–46.

The RA testified that she treated HPPO as a cash basis taxpayer. The Code requires the IRS to use a taxpayer's chosen method of accounting as long as it clearly reflects income. § 446(a). It is clear to the Court that HPPO used a hybrid method of accounting that reported its gross receipts from car sales using the accrual method and its expenses (and possibly other income) using the cash method. Taxpayers are permitted to use hybrid methods. *See* § 446(c)(4); Treas. Reg. § 1.446-1(a)(1). Respondent has not argued that HPPO's hybrid method does not clearly reflect income, and we find that it does. Rather, respondent tries to deny that the RA used the cash method even though the RA testified at trial that she used the cash method.

[*8]    The following facts support our findings that HPPO used the hybrid method and reported gross receipts on the accrual method. HPPO reported inventories on its returns and used inventories to compute COGS, which generally requires use of the accrual method for sales and purchases. *See* § 471 (requiring taxpayers that sell merchandise to use inventory accounting); Treas. Reg. § 1.446-1(c)(2)(i). Furthermore, the record establishes that HPPO included the entire sale price from a sale made on credit in its gross receipts in the year of sale; the record does not establish that HPPO had unreported, accrued income that required an accounts receivable. *See* Treas. Reg. § 1.446-1(c)(1)(ii) (requiring accrual method taxpayers to recognize income when "all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy," i.e., when the sale agreements with in-house financing were signed). We do not place any weight on its decision not to maintain a record of accounts receivable given the facts that it repossessed most cars within a year of sale and that it was a small, family-run business. Finally, its use of the hybrid method and reporting of expenses on the cash method explains the lack of accounts payable.

The RA's decision to use the cash method to reconstruct HPPO's income caused her to determine that HPPO significantly overreported its income for 2013–15 by a combined amount of nearly $3.25 million. She determined that HPPO underreported income for only one year, 2016, and by only $539,209. We find that the IRS's use of a bank deposit analysis to determine HPPO's 2016 gross income is incorrect. The RA's calculation that HPPO underreported its 2016 income likely resulted from her failure to make the required adjustments to account for amounts reported as income for prior years. The bank deposit analysis in fact proved the accuracy of HPPO's reporting over the years at issue. Respondent's use of the cash method distorted HPPO's income for individual years.

Mr. Aboui's credible testimony that he began winding down HPPO's business in 2014 explains why the deposits exceeded the reported gross income for 2016. He did not reinvest the proceeds in new inventory but deposited the funds into HPPO's bank accounts. HPPO's returns show significant decreases in used car inventory from $3.4–$3.6 million for 2011–13 to $1.3–$1.5 million for 2015–16. Mr. Aboui also credibly testified that HPPO received significant amounts of cash from its customers, which explains why the RA's reconstruction shows overreporting for 2013–15. There is no reason for us to question Mr. Aboui's veracity especially in the light of the fact that the RA's

**[*9]** reconstruction determined that HPPO overreported income for 2013–15 in amounts far greater than its alleged underreporting for 2016.

Using our best judgment, we hold that HPPO accurately reported its gross income for 2016. *See Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930); *see also Ray v. Commissioner*, T.C. Memo. 2018-160 (applying *Cohan* rule to determine the amount of unreported income); *Buske v. Commissioner*, T.C. Memo. 1998-29 (same); *Alanis v. Commissioner*, T.C. Memo. 1995-263 (same).

Respondent argues that HPPO failed to account for income from bartering with mechanics and that its unreported income for 2016 may be more than $539,209. Gross income includes bartered services. *Anaya v. Commissioner*, T.C. Memo. 1991-91, *aff'd*, 983 F.2d 186 (10th Cir. 1993); Treas. Reg. § 1.61-2(d)(1). Again, Mr. Aboui credibly testified that the mechanics provided invoices to HPPO and that the related income was reported. Moreover, sales to the mechanics in exchange for services were recorded in the dealer jackets. Mr. Aboui credibly testified that the bartered-for sale proceeds were included in gross receipts. Moreover, respondent forgets that bartering occurred during all years at issue, including when HPPO allegedly reported gross income in excess of its deposits. We find that the fact that HPPO engaged in bartering does not support a finding that it underreported its 2016 income.

II.    *COGS and Business Expenses Deductions*

Taxpayers may deduct ordinary and necessary expenses paid or incurred in carrying on any trade or business. § 162(a). Technically speaking, COGS is not a deduction; it is an adjustment subtracted from gross receipts in determining gross income. Treas. Reg. § 1.61-3(a); *see Metra Chem Corp. v. Commissioner*, 88 T.C. 654, 661 (1987). Taxpayers must maintain sufficient records to substantiate their business expenses and COGS. § 6001; *Nunn v. Commissioner*, T.C. Memo. 2002-250; Treas. Reg. § 1.6001-1(a). The Court may estimate the amount of an expense when it is persuaded that the taxpayer has incurred an expense and there is sufficient evidence for it to reasonably estimate the amount. *Cohan v. Commissioner*, 39 F.2d at 543–44. We also use the *Cohan* rule to estimate COGS. *See, e.g.*, *Olive v. Commissioner*, 139 T.C. 19, 34 (2012), *aff'd*, 792 F.3d 1146 (9th Cir. 2015); *Alterman v. Commissioner*, T.C. Memo. 2018-83, at *30–31.

**[\*10]** We do not apply the *Cohan* rule for business expenses that are subject to the heightened substantiation requirements of section 274(d). § 280F(d)(4)(A)(i), (iii); *Sanford v. Commissioner*, 50 T.C. 823, 827–28 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969); Treas. Reg. § 1.280F-6(b)(1)(i), (iii). Under section 274(d), taxpayers must substantiate certain expenses, including meal and entertainment, with adequate records of the amount, time and place, and business purpose of each expenditure or with sufficient evidence that corroborates the taxpayer's statements. Temp. Treas. Reg. § 1.274-5T(c)(1) and (2).

The RA used the bank deposit analysis to determine the amount of HPPO's COGS and deductible business expenses. On the basis of our review of the record, including the RA's workpapers, we find that the RA correctly determined that certain debits to HPPO's bank accounts are not deductible business expenses. However, we find use of the bank deposit analysis to determine the amounts of COGS and deductible business expenses unreliable.

Mr. Aboui was incredibly forthright in this testimony. He admitted that HPPO received cash and used it to pay wages and other expenses. Also, HPPO acquired significant inventory through trade-ins that was not accounted for as debits in HPPO's bank records. These facts, in addition to the RA's calculations that show reporting of gross income significantly greater than HPPO's deposits for 2013–15, make use of the bank deposit analysis to determine HPPO's COGS and deductible business expenses extremely inaccurate. Furthermore, there is no indication from our review of HPPO's returns that it deducted the payments from HPPO's bank accounts that the RA identified as nondeductible.

Petitioners provided extensive documentation at trial to substantiate the COGS and business expenses. Mr. Aboui testified that HPPO was unprofitable. Given the record in its entirety, we find that petitioners have substantiated HPPO's COGS and business expenses as reported on HPPO's returns for each year at issue, except for meal and entertainment expenses of $1,473, $1,078, $1,171, and $503 for 2013, 2014, 2015, and 2016, respectively, that are subject to the section 274 heightened substantiation requirements. Except for the meal and entertainment expenses, we find that HPPO is entitled to deduct COGS and business expenses as reported on its return for each year at issue, including the amounts it deducted as bad debts as discussed below.

**[\*11]** III.   *Bad Debt Deductions*

Taxpayers may deduct business debts that become worthless during the taxable year. § 166. Taxpayers must prove the amount and existence of the debt and that the debt became worthless during the taxable year. *Am. Offshore, Inc. v. Commissione*r, 97 T.C. 579, 593 (1991). Respondent disallowed HPPO's bad debt deduction for each year at issue in its entirety. He argues that HPPO had not previously reported the amount of the debt as income and, alternatively, that HPPO did not incur a loss because it repossessed the cars when the buyers failed to make payments.

First, as we stated above, the record establishes that HPPO included all sale proceeds in its income for the year of sale under the accrual method. Second, HPPO did not repossess all cars after the buyers failed to make payments. Mr. Aboui credibly testified that he was unable to repossess approximately 250 cars during the years at issue. The loss of these cars adequately substantiates the amount of HPPO's bad debt deductions for the years at issue under the *Cohan* rule. We find that HPPO is entitled to the claimed bad debt deductions for the years at issue in their entirety.

IV.   *NOL Deductions*

Section 172 permits taxpayers to deduct NOLs. An NOL is the excess of the taxpayer's allowable deductions over its gross income with certain modifications. § 172(c) and (d). In general, taxpayers may carry back an NOL for 2 years and, if not fully absorbed, may carry it forward for 20 years. § 172(b)(1)(A), (2), (3).

Taxpayers have the burden of establishing both the existence of an NOL and the amount that may be carried over to the years at issue. *Chico v. Commissioner*, T.C. Memo. 2019-123, at \*39, *aff'd*, No. 20-71017, 2021 WL 4705484 (9th Cir. Oct. 8, 2021). They cannot use their returns to substantiate NOL deductions. *See Sparkman v. Commissioner*, 509 F.3d 1149, 1156–57 (9th Cir. 2007), *aff'g* T.C. Memo. 2005-136; *Davison v. Commissioner*, T.C. Memo. 2023-139, at \*18.

Petitioners did not cite any evidence in the record to establish the existence and amount of an NOL. *See* Rule 151(e)(3). They have not established that they may deduct NOLs for the years at issue. Accordingly, they are not entitled to the claimed NOL deductions. *See Villanueva v. Commissioner*, T.C. Memo. 2022-27, at \*3–4.

**[\*12]** As we mentioned above, it is unclear to the Court whether petitioners deducted the passthrough losses reported on HPPO's 2014 and 2015 returns or included the passthrough gain on its 2016 return. They may have accounted for the income and gain as part of the NOL deductions. While we disallowed the NOL deductions in their entirety, petitioners are entitled to deduct passthrough losses from HPPO, and the parties shall compute and account for any deductible passthrough loss, as well as passthrough gain, in the Rule 155 computation.

V.    *Real Estate Losses*

Section 469 generally disallows deductions for passive activity losses. *See Lamas v. Commissioner*, T.C. Memo. 2015-59, at \*27. The Code defines a passive activity as the conduct of a trade or business in which the taxpayer does not materially participate. § 469(c)(1). Generally, rental activity is treated as passive regardless of whether the taxpayer materially participates. § 469(c)(2), (4), (j)(8).

There are exceptions to the general rule for: (1) real estate professionals as defined in section 469(c)(7) and (2) taxpayers who actively participate in rental real estate activities, who may deduct a maximum of $25,000 in passive losses per year under section 469(i). *See Moss v. Commissioner*, 135 T.C. 365, 368 (2010); *see also* Temp. Treas. Reg. § 1.469-1T(e)(3)(ii). Petitioners are not real estate professionals. Taxpayers actively participate in real estate activities if they participate in a significant and bona fide sense in making management decisions or arranging for others to provide services such as repairs. *See Madler v. Commissioner*, T.C. Memo. 1998-112. The $25,000 maximum passive loss deduction starts to phase out when a taxpayer's adjusted gross income (AGI) exceeds $100,000 and phases out entirely when AGI reaches $150,000 (threshold amount). § 469(i)(3).

In the Notice of Deficiency respondent disallowed real estate loss deductions of $25,000 for each year at issue on the basis that petitioners' redetermined AGI exceeds the threshold amount. In his Answer respondent asserted that petitioners improperly deducted $43,629 in real estate losses for 2014 and asserted an increased deficiency. Respondent has the burden of proof for the increased disallowance and increased deficiency. *See* Rule 142(a)(1).

On brief respondent argues that petitioners did not establish that they are real estate professionals or that they actively participated in the rental activities. The fact that petitioners are not real estate

**[\*13]** professionals has no bearing on our decision as they may deduct the claimed losses as active participants. Respondent raised the active participation requirement for the first time on brief. In his Pretrial Memorandum, respondent did not list the real estate loss deductions as an issue for consideration for trial. Accordingly, the Court understood that the real estate loss issue involved only a computation adjustment under the phaseout and the threshold rules of section 469(i). We will not allow respondent to raise the active participation requirement as a new issue posttrial because it would unduly prejudice petitioners. *See Dirico v. Commissioner*, 139 T.C. 396, 415–17 (2012). Accordingly, we treat petitioners as actively participating in their rental activities and hold that they may deduct $25,000 in real estate losses for 2013, 2015, and 2016, subject to the phaseout and threshold rules of section 469(i) as determined in the Rule 155 computation.

Petitioners' $43,629 deduction for 2014 is the deductible carryforward of prior-year unused passive losses that they may use to offset their 2014 passive income from their rental properties. On Schedule E petitioners reported income of $88,795 from 13 rental properties and offset the income from 6 properties with unused passive losses totaling $43,629. They did not carryforward any unused passive losses for the other seven properties. Respondent has not established that the use or calculation of the carryforwards is improper to satisfy his burden of proof for the increased disallowance. Taxpayers may carry forward unused passive losses indefinitely to offset income from the same activity. § 469(b). Accordingly, we find that petitioners may deduct $43,629 in real estate losses for 2014.

VI.  *Shareholder Distributions*

The tax treatment of shareholder distributions from an S corporation depends on the corporation's accumulated earnings and profits and the shareholder's basis in the corporation's stock. *See* § 1368. Neither party contends, and the record does not reflect, that HPPO had accumulated earnings and profits during any year at issue. In such a case a distribution is not included in the shareholder's gross income to the extent of his adjusted basis in his stock. § 1368(b)(1).

Section 1367 provides basis adjustment rules applicable to stock in S corporations. In general a shareholder's stock basis is increased by passthrough income and decreased by distributions not includible in the shareholder's income, passthrough losses and deductions, and certain

**[\*14]** nondeductible, noncapital expenses. § 1367(a); *see also Gleason v. Commissioner*, T.C. Memo. 2006-191, slip op. at 14.

Respondent determined that petitioners failed to report approximately $7.5 million in taxable distributions from HPPO during the years at issue. Mr. Aboui readily admitted that he received distributions. He testified that he provided the information to his accountant and did not know whether the distributions were reported. The RA also treated some expenses paid and other transfers from HPPO's bank accounts as shareholder distributions, including payments relating to petitioners' rental property activities.

Respondent determined that Mr. Aboui received distributions of $2,476,301, $1,704,329, $1,406,893, and $1,934,033 during 2013, 2014, 2015, and 2016, respectively, which he determined were taxable. Petitioners did not challenge respondent's treatment of the withdrawals and non-HPPO expenses paid from HPPO's bank accounts as shareholder distributions or challenge the amounts determined by respondent. Accordingly, we find that respondent's calculations of the amounts of the distributions are correct.

However, we agree with petitioners that some distributions are a nontaxable return of capital. *See* § 1368(b); *see also* Treas. Reg. § 1.1368-1(a). Distributions after stock basis has been exhausted are treated as gain from the sale or exchange of property. § 1368(b)(2). Respondent did not take into account Mr. Aboui's basis in HPPO when determining the taxable amounts of the distributions.

Taxpayers must substantiate their basis in an asset for the purpose of determining the amount of their gain or loss when they dispose of the asset. *Cullins v. Commissioner*, 24 T.C. 322, 328 (1955). Where a taxpayer lacks adequate records of its basis in an asset, we have applied the *Cohan* rule to estimate the basis of the asset if the taxpayer has provided some reasonable evidentiary ground upon which to make such an estimate. *Frazier v. Commissioner*, T.C. Memo. 2024-3, at \*135–36; s*ee also Prosperity Co. v. Commissioner*, 17 T.C. 171, 186 (1951), *aff'd per curiam*, 201 F.2d 499 (2d Cir. 1953); *Shank v. Commissioner*, T.C. Memo. 2018-33.

Respondent argues that petitioners have not established Mr. Aboui's basis in HPPO during the years at issue. We disagree and find that the record and Mr. Aboui's credible testimony provides sufficient evidence for us to reasonably estimate his basis under the *Cohan* rule.

**[\*15]** We find that Mr. Aboui's basis in HPPO was $5,090,383 at the beginning of 2013. Mr. Aboui's basis in HPPO exceeded the distributions for 2013 and 2014, and no part of the distributions is taxable for either year. We have calculated Mr. Aboui's basis at yearend 2015 and 2016 on the basis of HPPO's return reporting. We find that Mr. Aboui received taxable distributions of $642,605 and $1,919,967 during 2015 and 2016, respectively.[2]

## VII.  *Penalties*

Section 6662(a) imposes an accuracy-related penalty for any portion of an underpayment of tax required to be shown on a return that is due to negligence under section 6662(b)(1) or a substantial understatement of income tax under section 6662(b)(2). An understatement is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. § 6662(d). The section 6662(a) penalty will not apply where the taxpayers establish that they acted with reasonable cause and in good faith. § 6664(c)(1). A determination of reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances, but the most important factor is the taxpayers' efforts to assess their proper liability. Treas. Reg. § 1.6664-4(b). Reasonable reliance on professional advice may also constitute reasonable cause. *Id.* para. (c)(1)(i).

To the extent that petitioners underpaid their tax for any year at issue, we find that the underpayment was not due to negligence and that they acted with reasonable cause and in good faith. They kept substantial records of HPPO's business, provided them to their accountant, and reasonably relied on him to prepare HPPO's returns as well as their personal returns. Accordingly, we hold that petitioners are not liable for any penalties.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

---

[2] We recomputed basis using HPPO's reported ordinary income and loss for the years at issue and other applicable reported items of income and expenses. To the extent that our holdings redetermine HPPO's ordinary income or loss, the parties may recompute Mr. Aboui's basis and the taxable portion of the distributions in the Rule 155 computation. However, the parties shall limit the recomputation of basis solely to account for changes to HPPO's ordinary business income or loss that is reported on line 21 of the S corporation return.

**[\*16]**  To reflect the foregoing,

*Decision will be entered under Rule 155.*